# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 15, 2018        Decided January 15, 2019

No. 16-1433

SAN DIEGO GAS & ELECTRIC COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PACIFIC GAS AND ELECTRIC COMPANY, ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Kevin King* argued the cause for petitioner. With him on the briefs were *James R. Dean Jr.*, *Mark L. Perlis*, and *Jonathan J. Newlander*.

*Rebecca A. Furman* and *Keith T. Sampson* were on the brief for intervenors Southern California Edison Company, et al., supporting petitioner.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief

were *David L. Morenoff*, General Counsel, *Robert H. Solomon*, Solicitor, and *Ross R. Fulton*, Attorney.

*Bonnie S. Blair*, *Margaret E. McNaul*, *Rebecca L. Shelton*, *Lisa S. Gast*, *Peter J. Scanlon*, *Michael Postar*, and *Bhaveeta K. Mody* were on the joint brief for intervenors Cities of Anaheim, Azusa, Banning, Colton, Pasadena, and Riverside, California, et al., supporting respondent.

Before: ROGERS and PILLARD, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

PILLARD, *Circuit Judge*:  Petitioner San Diego Gas & Electric Company (SDG&E) seeks review of a Federal Energy Regulatory Commission (FERC or Commission) declaratory order applying FERC's cancelled or abandoned electricity transmission facilities incentive, 18 C.F.R. § 35.35(d)(1)(vi) (Abandonment Incentive), only prospectively, to investment that had yet to occur.  FERC grants the Abandonment Incentive to qualifying transmission infrastructure projects to facilitate financing by assuring that ratepayers may be charged for the project if it is abandoned for reasons beyond the utility's control.  *Id*.  SDG&E's application acknowledged that the utility had already obtained needed investment and proceeded with the project for four years "without assurance of cost recovery for these development costs."  Pet. for Declaratory Order of San Diego Gas & Electric Company 16 (Sept. 23, 2015), Joint App'x (J.A.) 44.  Reasoning that the role of the Abandonment Incentive is to facilitate investment by hedging abandonment risk, rather than to reward investments that

would happen in any event, the Commission found that SDG&E had failed to establish the requisite nexus between the Abandonment Incentive and costs it already incurred before it obtained the declaratory order. SDG&E claims that the order's limitation to future costs is contrary to the Abandonment Incentive's terms and arbitrary and capricious. For the reasons that follow, we deny the petition.

I.

A.  Regulatory Context

In an effort to bolster investment in "reliable and economically efficient" energy transmission infrastructure, Congress in 2005 amended the Federal Power Act (FPA), 16 U.S.C. § 792 *et seq*., to require FERC to promulgate a rule to establish "incentive-based" rate treatments in order to "promot[e] capital investment" in projects to upgrade the electricity grid. *Id.* § 824s(a), (b)(1); *see* Energy Policy Act of 2005, Pub. L. No. 109-58, § 1241, 119 Stat. 961 (2005) (codified as amended at 16 U.S.C. § 824s). Congress's express purpose in calling for such a rule was to "benefit[] consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion." 16 U.S.C. § 824s(a). In Congress's view, because such a rate-treatment rule would enable needed upgrades to infrastructure on which reliable and efficient electric service depends, it would ultimately benefit consumers, even as it also cost them. *See id.* Any rate FERC approves under the rule, Congress stipulated, must be "just and reasonable and not unduly discriminatory or preferential." *Id*. § 824s(d).

The Commission adopted its Incentive Rule the following year, *see* Transmission Infrastructure Investment (Incentive Rule), 18 C.F.R. § 35.35 (2006), and refined it through two

rehearing orders and a policy statement, *see* Promoting Transmission Investment Through Pricing Reform, Order No. 679, 116 FERC ¶ 61,057 (2006), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007); Promoting Transmission Investment Through Pricing Reform, 141 FERC ¶ 61,129 (2012) (Policy Statement).

The Incentive Rule establishes eight categories of incentive-based rate treatments for public utilities. 18 C.F.R. § 35.35(d). Three prerequisites must be met by each applicant seeking any of those treatments:

> The applicant must demonstrate [1] that the facilities for which it seeks incentives either ensure reliability or reduce the cost of delivered power by reducing transmission congestion consistent with the requirements of section 219 [of the Federal Power Act], [2] that the total package of incentives is tailored to address the demonstrable risks or challenges faced by the applicant in undertaking the project, and [3] that resulting rates are just and reasonable.

*Id.* The Rule invites an applicant to request a "package of incentives . . . tailored" to its particular needs. *Id.* In so doing, the applicant must make its case for including in its rates each of the incentive-based rate treatments it requests. The Rule defines "incentive-based rate treatment" to mean any of the following:

(i)  A rate of return on equity sufficient to attract new investment in transmission facilities;

(ii)  100 percent of prudently incurred Construction Work in Progress (CWIP) in rate base;

(iii)  Recovery of prudently incurred pre-commercial operations costs;

(iv)  Hypothetical capital structure;

(v)  Accelerated depreciation used for rate recovery;

(vi)  Recovery of 100 percent of prudently incurred costs of transmission facilities that are cancelled or abandoned due to factors beyond the control of the public utility;

(vii)  Deferred cost recovery; and

(viii) Any other incentives approved by the Commission . . . that are determined to be just and reasonable and not unduly discriminatory or preferential.

*Id.* § 35.35(d)(1).  The Commission authorized each of these incentives as a means to "encourage new infrastructure," but cautioned that they should be applied in a case-specific manner, only where appropriate, to avoid "increasing rates in a manner that has no correlation to encouraging new investment." Order No. 679, 116 FERC ¶ 61,057 at P6.

The incentive at issue here—the cancelled or abandoned transmission facilities incentive, 18 C.F.R. § 35.35(d)(1)(vi) (Abandonment Incentive)—encourages new investment in transmission infrastructure projects by offsetting some of the largest and least predictable downside investment risks of these projects, "such as generation developers' decisions to develop or terminate the development of potential resources or difficulty obtaining state or local siting approvals."  Order No.

679, 116 FERC ¶ 61,057 at P155. By assuring recovery of costs of projects abandoned for reasons beyond their developers' control, the Abandonment Incentive "provid[es] companies with more certainty during the pre-construction and construction periods," Policy Statement, 141 FERC ¶ 61,129 at P14, "thereby facilitating investment in these projects," Order No. 679, 116 FERC ¶ 61,057 at P155. An applicant for the Abandonment Incentive must show that it faces the kinds of known but uncontrollable cancellation risks that, without the incentive, could impair the applicant's ability to attract investment to the project, or raise the utility's—and, in turn, ratepayers'—cost of such investment. The Commission explained that it would evaluate applications for this incentive on a "case-by-case basis." Order No. 679, 116 FERC ¶ 61,057 at P164.

The Commission developed the Abandonment Incentive against the backdrop of its standard, burden-sharing treatment of costs of abandoned transmission infrastructure projects. An order the Commission issued in 1988 authorized utilities to split the costs of cancelled projects 50-50 with their consumers through rate increases, provided the utilities demonstrated the need to recover the investment, and that the costs at issue were prudently incurred. *See New Eng. Power Co.*, Op. No. 295, 42 FERC ¶ 61,016 (1988); *see also New Eng. Power Co.*, Op. No. 49, 8 FERC ¶ 61,054 (1979). Under the new Abandonment Incentive provision of the Incentive Rule, utilities may, on a showing of a nexus between exposure to risk from project abandonment and difficulty or costs of attracting needed investment, obtain an order of eligibility to recover "100 percent of prudently incurred costs of transmission facilities that are cancelled or abandoned due to factors beyond the control of the public utility." 18 C.F.R. § 35.35(d)(1)(vi); *see* 16 U.S.C. § 824s.

The Abandonment Incentive is just one of an open-ended set of incentive rate treatments the new Incentive Rule authorizes, entitlement to which depends on an order of approval from the Commission. Each utility that proposes to enhance transmission infrastructure may apply for a package of incentives customized to its particular circumstances. The Commission then determines whether and how the requested incentives are warranted before it approves any corresponding rate authority.

Transmission upgrades vary in size, complexity, and the risks and challenges they face, so no one-size-fit-all package of incentives is—or could be—secured by the Rule itself. The Incentive Rule "does not grant incentive-based rate treatments or authorize any entity to recover incentives in its rates," but only "informs potential applicants of incentives that the Commission is willing to allow when justified." Order No. 679, 116 FERC ¶ 61,057 at P20. The seven specified incentives are themselves partially overlapping and context-specific. And the eighth category—a catchall authorization of "[a]ny other incentives approved by the Commission," 18 C.F.R. § 35.35(d)(1)(viii)—underscores the Rule's contemplation of case-by-case applications based on appropriate showings, and that entitlement to an incentive rate treatment depends on an order authorizing it.

All of the incentives share the common overall objective of facilitating improvements to transmission infrastructure, but they do so in a range of ways. Two of the incentives encourage investment in infrastructure projects by providing a way to ease a developer's cash flow in advance of the project coming on line, which in turn can improve "the overall financial health of a company and its ability to attract capital at reasonable prices." *See* Order No. 679, 116 FERC ¶ 61,057 at P103. The CWIP incentive, *see* 18 C.F.R. § 35.35(d)(1)(ii), for example, "allows

recovery of a return on construction costs during the construction period rather than delaying cost recovery until the plant is placed into service." Policy Statement, 141 FERC ¶ 61,129 at P12. Similarly, the pre-commercial operations costs incentive, 18 C.F.R. § 35.35(d)(1)(iii), allows utilities to recover other early project costs incurred before the facility is up and running, such as expenditures for "preliminary surveys, plans and investigations, made for the purpose of determining the feasibility of utility projects and costs of studies and analyses mandated by regulatory bodies related to the plant in service." *See* Order No. 679, 116 FERC ¶ 61,057 at P122 n.82.

Additional incentives can address the timing of cost recovery after a project is in use. The Commission may authorize a utility to accelerate depreciation in order to recover costs more quickly than over the life of the project—effectively charging ratepayers in the near term for facilities that will be in use far into the future. *See* 18 C.F.R. § 35.35(d)(1)(v); Order No. 679, 116 FERC ¶ 61,057 at P146. Or the Commission may allow a utility to defer cost recovery where, for example, it is under a retail rate freeze that would prevent full recovery in the ordinary course, *id*. § 35.35(d)(1)(vii)—authority the Commission has committed to exercise consistently with state authority over retail ratemaking, *see* Order No. 679, 116 FERC ¶ 61,057 at P177.

An application to qualify for any of the rate treatments authorized by the Incentive Rule must meet the Rule's "nexus test" by demonstrating that "the total package of incentives" the utility seeks is "tailored to address the demonstrable risks or challenges faced by the applicant in undertaking the project." 18 C.F.R. § 35.35(d). A utility must, in other words, show a link between each requested incentive and the utility's ability to address the project's risks and hurdles that correspond to that incentive. *See* Order No. 679, 116 FERC ¶ 61,057 at

P26. The Commission underscored that, because incentives must be "rationally tailored" to the risks presented by an investment, "[n]ot every incentive will be available for every new investment." *Id.* The requirement of a demonstrated, case-specific nexus tethers each authorized incentive rate increase to a determination that granting that incentive in a given case actually serves Congress's objective of benefiting consumers. To that end, the Commission assured commenters on the Incentive Rule that it would scrutinize incentive applications to make sure every authorized rate treatment was tailored to its relevant objective.

The Commission identified two ways for utilities to apply for incentive-based rate treatments. Under the one-step option, a utility may seek a specified increase in its rates under Section 205 of the FPA. *See* Order No. 679, 116 FERC ¶ 61,057 at P79. Under the two-step option, a utility may petition for a declaratory order establishing its eligibility to increase rates pursuant to an applicable incentive and later, armed with the declaratory order, seek the Commission's approval for a specific rate increase under Section 205. *See* 16 U.S.C. § 824d; Order No. 679, 116 FERC ¶ 61,057 at PP76-77, 166. A utility's choice between these procedural options is likely influenced by the types of incentives it seeks. The Commission noted that the option to apply for a declaratory order well in advance of a rate petition would be particularly useful for utilities "prior to commencing siting, permitting and construction activities because such orders facilitate financing and investment in new facilities." Order No. 679, 116 FERC ¶ 61,057 at P77.

The Commission takes the position that the Abandonment Incentive supports recovery of 100 percent of costs prudently incurred only insofar as those costs were incurred after the effective date of the order approving the utility's application.

*See PJM Interconnection, LLC*, 142 FERC ¶ 61,156 (2013) ("*PJM II*"). In a series of orders, it has similarly limited recovery of the incentive to prospective costs. *See, e.g., Pac. Gas & Elec. Co.*, 163 FERC ¶ 61,187 at P14 (2018); *Citizens Energy Corp.*, 162 FERC ¶ 61,161 at P26 (2018); *S. Cal. Edison Co.*, 161 FERC ¶ 61,107 at P44 (2017); *Republic Transmission, LLC*, 161 FERC ¶ 61,036 at P29 (2017); *DCR Transmission, LLC*, 153 FERC ¶ 61,295 at P42 (2015). As FERC frames its approach, "the date an order is issued under Order No. 679 reflects the separating point between the period in which an applicant is entitled to the full Abandoned Plant Incentive authorized under Section 219 and 50 percent recovery under Opinion No. 295's cost-sharing policy." *Pac. Gas & Elec. Co.*, 163 FERC ¶ 61,187 at P14.

## B. The Declaratory Order

SDG&E is a public utility that provides energy services in California. It brings electricity to approximately 300,000 residents in Southern Orange County through a single substation. Around 2008, the utility grew concerned that its customers would be at risk of service unreliability and even prolonged power outages should the sole substation falter. SDG&E therefore proposed the South Orange County Reliability Enhancement (SOCRE) Project to rebuild and upgrade the substation, and replace and relocate several transmission and distribution line segments.

The California Independent System Operator (CAISO) is a public entity that manages electricity transmission in California and operates transmission facilities owned by utilities such as SDG&E. In May 2011, the CAISO included the SOCRE Project in its 2010-2011 Transmission Plan.

SDG&E thereafter applied for various federal, state, and local permits for the SOCRE Project, including a Certificate of Public Convenience and Necessity from the state regulatory authority, the California Public Utilities Commission (CPUC). According to SDG&E's Vice President, obtaining a Certificate of Public Convenience and Necessity is "[a]s a general matter . . . a lengthy and complex process" that includes an environmental review of the project proposal. Test. of David Geier, J.A. 64. SDG&E later claimed that the California Public Utilities Commission's approval process presented "the greatest level of risk and uncertainty" for the SOCRE Project. Incentive Petition 12, J.A. 40. SDG&E applied for a Certificate of Public Convenience and Necessity in May 2012.

In September 2015, SDG&E sought a declaratory order from FERC establishing its eligibility for the Abandonment Incentive. SDG&E's petition stated that it had "already expended substantial resources, both direct spending and internal labor" on the project, to the tune of approximately $31 million. *See* Incentive Petition 16, J.A. 44. It noted that it had spent that much—and presumably procured whatever financing required to do so—"without assurance of cost recovery for these development costs." *Id.* As SDG&E described the situation, a "substantial percentage of those costs were incurred on the preparation of the utility's development plan, and were incurred with no certainty that SDG&E's development plan would be approved by the CPUC." *Id.* at 16-17, J.A. 44-45. SDG&E does not appear to have applied for any other incentive, such as CWIP or pre-commercial operations cost recovery under Section 35.35(d)(1)(ii) or (iii).

The Commission filed a Federal Register notice inviting interventions and protests regarding SDG&E's petition for the Abandonment Incentive. *See San Diego Gas & Electric Co.; Notice of Petition for Declaratory Order*, 80 Fed. Reg. 58,729-

02 (2015). The California cities of Anaheim, Azusa, Banning, Colton, Pasadena, and Riverside (Six Cities) filed a formal protest that invoked the Commission's decision in *PJM II* and argued that here, as there, the Commission should not apply the Abandonment Incentive to authorize SDG&E to recover from ratepayers sunk costs SDG&E had previously incurred. *See Protest on Behalf of the Cities of Anaheim, Azusa, Banning, Colton, Pasadena, and Riverside, California* (Oct. 23, 2015), J.A. 179, 182. SDG&E had made a voluntary business decision to spend $31 million on the SOCRE project without any order from the Commission declaring its eligibility for the incentive, the Six Cities argued, so no nexus had been shown and consumers should not be on the hook to reimburse it for those costs in the event the project is abandoned. *See id.* at 3-4, J.A. 181-82.

In its March 2, 2016, declaratory order, the Commission determined that, should the SOCRE project be cancelled or abandoned for reasons beyond SDG&E's control, the utility would be eligible to recover all of its prudently incurred costs associated with the SOCRE project going forward. *See San Diego Gas & Elec.*, 154 FERC ¶ 61,158 at PP17-18 (2016) (Declaratory Order). As for the costs that SDG&E had already incurred, the Commission held that SDG&E could share that burden with ratepayers under FERC's 1988 Opinion No. 295, which granted utilities authority to charge ratepayers half the prudently incurred costs of abandoned transmission facilities. *See id.* at P18; *New Eng. Power Co.*, Op. No. 295, 42 FERC ¶ 61,016. The Commission reasoned that, while "the risks that may necessitate abandonment have generally been known to SDG&E since the project was included in the CAISO 2010-2011 Transmission Plan, [SDG&E] did not seek approval for the Abandonment Incentive for approximately four years." Declaratory Order, 154 FERC ¶ 61,158 at P20. The Commission highlighted SDG&E's acknowledgement that it

had incurred the costs "without assurance of cost recovery." *Id.* (quoting Incentive Petition 16, J.A. 44). Allowing recovery of SDG&E's past investment under these circumstances would therefore be "contrary to the general policy rationale that incentives are designed to encourage future transmission investments" and "would violate the objective of benefitting consumers." *Id.* at P20 & n.48 (quoting *Incentive Ratemaking for Interstate Natural Gas Pipelines, Oil Pipelines, and Elec. Utils.*, 61 FERC ¶ 61,168, at ¶ 61,589 (1992)).

The Commission denied SDG&E's request for rehearing. *See San Diego Gas & Elec.*, 157 FERC ¶ 61,056 (2016) (Rehearing Order). In the Rehearing Order, the Commission reiterated that, under the Incentive Rule and the *PJM II* order applying it, the Abandonment Incentive covered costs incurred after the date of the order granting the incentive. *Id.* at PP10-15 (citing *PJM II*, 142 FERC ¶ 61,156 (2013)). The result, the Commission reasoned, was rooted in the Incentive Rule's nexus test, which requires the applicant "to demonstrate that the incentives are rationally related with the investments being proposed." *Id.* at P16 (quoting Order No. 679, 116 FERC ¶ 61,057 at P48). Thus, when SDG&E asserted that it incurred the $31 million in prior costs without assurance of recovery, "it conceded that the Abandonment Incentive it seeks here is not rationally related to those previously incurred costs." *Id.* at P17. The Commission determined that, for costs already incurred, the nexus test was not met because there was no showing that "the incentive was [] needed to encourage SDG&E to make the investment in question." *Id.* at P19.

This petition for review followed. Pacific Gas & Electric Company and Southern California Edison Company intervened in support of SDG&E. The Six Cities intervened in support of the Commission.

14

II.

A.  Standing

We begin by assuring ourselves of jurisdiction over the petition.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  Under Section 313(b) of the FPA, we have jurisdiction to review petitions only from parties "aggrieved" by an order of the Commission.  16 U.S.C. § 825*l*(b); *cf. PNGTS Shipper's Grp. v. FERC*, 592 F.3d 132, 138-39 (D.C. Cir. 2010) (finding a virtually identical provision in the Natural Gas Act to be "jurisdictional").  And, under Article III, a petitioner's standing to pursue its claim in federal court depends on its identification of a concrete and particularized injury that is fairly traceable to the challenged action and would be redressable by a favorable court decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  A party is determined to be aggrieved within the meaning of Section 313(b) on the same showing of injury that suffices to establish standing.  *See Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1219 (D.C. Cir. 2009).

The Commission's orders concern SDG&E's eligibility to recover a benefit in the event of a future project cancellation or abandonment that may or may not occur.  But its claimed harm is not speculative insofar as SDG&E suffers a concrete and immediate economic injury stemming from the demonstrated risk of project cancellation.  The abandonment may never occur, but there is a concrete dispute over the scope of the current beneficial assurance due to SDG&E.  In its declaratory order, FERC recognized that SDG&E faces real and present costs due to the risk of a future halt to the project, and FERC determined that those costs justified application of the Abandonment Incentive.  No party disputes that determination; all agree that project-cancellation risk makes SDG&E's

SOCRE project a less attractive investment for outside funders and partners, increasing costs to SDG&E. *See* Pet'r Br. Addendum B, Decl. of David Geier ¶¶ 11-15. We have previously held this sort of current economic injury from identified risk of future harm sufficient to support standing, *see Great Lakes Gas Transmission v. FERC*, 984 F.2d 426, 430-31 (D.C. Cir. 1993), and do so again here.

## B. Analysis

In the declaratory order under review, the Commission held that SDG&E had shown a nexus only between the Abandonment Incentive and the utility's expenditures on the SOCRE project going forward. *See* Declaratory Order, 154 FERC ¶ 61,158 at PP17, 19. On rehearing, the Commission reiterated that the Abandonment Incentive's nexus test requires a showing that authorizing the incentive will "encourage action that has not yet occurred." *See* Rehearing Order, 157 FERC ¶ 61,056 at P15. No such nexus existed between the Abandonment Incentive and SDG&E's sunk costs, because SDG&E admitted that it incurred those costs "without assurance of cost recovery." *Id.* at P17 (quoting Incentive Petition 16, J.A. 44). The Commission thought it "reasonable to conclude that if SDG&E in fact spent $31 million in development costs over an approximately four-year period, a significant amount of money over a significant time period, an Abandonment Incentive was not needed to encourage that investment." *Id.* at P19. The Commission therefore held that, in SDG&E's case, insofar as the application sought the Abandonment Incentive for the portion of the project that was already financed and paid for, it lacked the requisite nexus to the facilitation of new investment, such as by making capital more readily and cheaply available.

SDG&E challenges the order, claiming that the Incentive Rule itself makes an "offer" of incentive treatment, Pet'r. Br. 12, and that any utility's qualifying application thus constitutes binding acceptance entitling it to all prudently incurred costs. SDG&E insists that, for the Abandonment Incentive, the rule establishes a "fixed 100 percent recovery rate" of costs of the entire "transmission facilities" subject to abandonment. Pet'r Br. 13, 23, 34. It thus claims a right, in the event the SOCRE project should in the future be abandoned for reasons beyond SDG&E's control, to recover *all* development costs from the Project's inception, including those costs incurred before the Commission deemed it eligible for the Abandonment Incentive. Pet'r Br. 31.

The Commission responds that the Rule sets the general terms, but a utility's entitlement depends on FERC's approval. It could hardly be otherwise. Electricity transmission development projects tend to be complex, varied, and expensive—costing many millions or even billions of dollars and taking years to complete. The Incentive Rule provides for an array of incentive rate treatments, including a catchall "other incentives" category, *see* 18 C.F.R. § 35.53(d)(1)(viii), available for customization into an application package that FERC approves to the extent it meets a utility's demonstrated need. An applicant must show a nexus between each incentive it seeks and that incentive's role in financing reliable and economically efficient transmission infrastructure. The Commission found that nexus to the Abandonment Incentive lacking with respect to SDG&E's investments already made.

The Commission's approach comports with both the Federal Power Act and the Incentive Rule. When Congress amended the Act in 2005, it called on FERC to promulgate a rule to "benefit[] consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission

congestion." 16 U.S.C. § 824s(a); *see* 18 C.F.R. § 35.35(a) (same). The Commission in the preamble to the Incentive Rule elaborated that it would not authorize incentives that "simply increas[e] rates in a manner that has no correlation to encouraging new investment." Order No. 679, 116 FERC ¶ 61,057 at P6. Instead, incentives must be "rationally tailored" to the relevant investment and will not function as a "bonus for good behavior." *Id.* at P26. The Commission has underscored the key role of the nexus requirement "to ensure that incentives are not provided in circumstances where they do not materially affect investment decisions." Order No. 679-A, 117 FERC ¶ 61,345 at P25. We stressed in *Connecticut Department of Public Utility Control v. FERC* that the nexus test is not merely "fig leaf for accepting any link, however nominal or trivial," but must be shown to "affect the transmission owners' conduct or benefit consumers." 593 F.3d 30, 33-34 (D.C. Cir. 2010).

The Commission's order aligns with its "longstanding policy that rate incentives must be prospective and that there must be a connection between the incentive and the conduct meant to be induced." *Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966, 977 (9th Cir. 2018) (citing *S. Cal. Edison*, 114 FERC ¶ 61,018 (2006); *ISO New Eng.*, 96 FERC ¶ 61,359 (2001); *New Eng. Power Pool*, 97 FERC ¶ 61,093 (2001)). Indeed, the Commission made clear in a policy statement nearly three decades ago that "[i]ncentive rate plans must be prospective." *See Incentive Rate Making for Interstate Natural Gas Pipelines, Oil Pipelines, and Elec. Utils.*, 61 FERC ¶ 61,168, at ¶ 61,599. Presaging the very reasoning it invoked in the order under review, the Commission declared: "A 'reward' for past behavior," after all, "does not induce future efficiency and benefit consumers." *Id.* Our review of rate-based incentive programs has never questioned the "obvious proposition" that the Commission "will not, and cannot, create incentives to

motivate conduct that has already occurred." *Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 289 (D.C. Cir. 2006); *see Conn. Dep't of Pub. Util. Control*, 593 F.3d at 34-35.

The Incentive Rule makes a palette of incentive rate treatments available to utilities. Transmission infrastructure investment projects may be eligible for one or more of the seven types of incentives the Rule describes, 18 C.F.R. § 35.35(d)(1)(i)-(vii), or for some needed "other incentive" not within the Rule's stated categories, *id.* § 35.35(d)(1)(viii). The burden is on the utility to show that it qualifies for each requested incentive rate. The Rule's incentives must be sought by application and secured by a FERC order. While the utility need not demonstrate "but for" causation between a particular investment and the incentive it seeks, *see* Order No. 679, 116 FERC ¶ 61,057 at P48, the Commission must ensure that "incentives are not provided in circumstances where they do not materially affect investment decisions," Order No. 679-A, 117 FERC ¶ 61,345 at P25. To that end, the nexus test requires an applicant to show "that there is a relationship between the rate treatments sought and the attraction of new capital." *Id*. at P17.

The logic of the incentive rate treatment at issue here—the Abandonment Incentive—supports the Commission treating it as unwarranted for SDG&E's pre-order costs. In the ordinary course, utilities recover costs through the rates they charge for delivered power. A transmission infrastructure project that is abandoned never delivers power, so its costs might not ordinarily be chargeable to ratepayers. Project-abandonment risk can, however, impede major, cost-effective transmission upgrades that are in ratepayers' interests. Investors hesitate to invest in large, expensive projects that may fail before they ever earn a dime. And developers of projects facing abandonment risk—a kind of risk that, by definition, is major

and uncontrollable—will pay more for capital. FERC's Abandonment Incentive reflects the recognition that that, given the elevated capital costs ratepayers shoulder for all infrastructure investment projects at risk of abandonment, ratepayers benefit by, in effect, paying to insure potential investors against such risk. Specifically, the Abandonment Incentive serves ratepayers' interests when the aggregate savings (from all qualifying projects' lower *ex ante* capital costs, producing more needed reliability improvements) more than offset losses (from projects that must be abandoned and billed to ratepayers). In other words, the logic of authorizing utilities to charge ratepayers for the occasional abandoned project is that ratepayers enjoy offsetting benefits from improved access to capital on better terms for all other qualified transmission infrastructure upgrades.

SDG&E acknowledges that it incurred substantial costs on the SOCRE project before it secured eligibility for the Abandonment Incentive. Where, as here, a project faces abandonment risk, investors would ordinarily charge risk premiums unless they had assurance of abandoned-plant rate recovery. Yet there is no evidence that SDG&E's four years' worth of investment in the project was beneficially affected by any assurance provided through the Abandonment Incentive. Indeed, as FERC recognized, SDG&E's claim that the Incentive Rule facilitated its $31 million in expenditures before FERC authorized it to charge incentive rates is belied by SDG&E's own acknowledgement that it incurred those costs "without assurance of cost recovery." Incentive Petition 16, J.A. 44; Declaratory Order, 154 FERC ¶ 61,158 at P20. The utility's Vice President repeatedly emphasized in the future tense that the incentive "*will* reduce the financial and regulatory risks associated with" transmission investment in the SOCRE Project. Test. of David Geier, J.A. 74 (emphasis added); *accord id.* J.A. 75 ("As a general matter, assurance that

prudently incurred costs can be recovered should abandonment be required for a reason beyond the developer's control, supports investment of significant equity capital on project development."). But SDG&E made no showing how future risk-reduction from the Abandonment Incentive affected its investments already made.

By insisting that the timing of a declaratory order matters in granting the Abandonment Incentive, FERC reasonably accounts for ratepayers' interests. Where FERC commits ratepayers to cover costs of abandoned projects, it should at least demand that utilities maximize ratepayers' benefits from those commitments. The longer a utility waits to secure abandoned-plant rate authority and the more it spends before doing so, the higher its costs of capital in constructing successful projects—costs that ultimately are passed on to ratepayers. Nothing in the statute or Rule requires that FERC authorize charging ratepayers *ex post* (via rate-recovery for failed projects) in the name of generating *ex ante* benefits (capital availability at lower cost) for a portion of those *ex ante* benefits (superior investment terms during the first four years of the project) that they never enjoyed. Put differently, ratepayers who stand to be billed for risk premiums paid over several years should not also be called on to pay for a retroactive hedge against the very same risk.

SDG&E raises several objections, none of which we find persuasive.

*First*, SDG&E asserts that the regulation itself, rather than the Commission's project-specific declaratory order, amounts to a legally binding "offer" of rate treatment. *See* Pet'r Br. 43-46; Pet'r Int. Br. 3. Insisting that "[t]he text of Order No. 679 could not be clearer," Pet'r Br. at 44, SDG&E quotes the preamble's assertion that "this [Incentive] Rule . . . provides

incentives for transmission infrastructure," Order No. 679, 116 FERC ¶ 61,057 at P1. SDG&E observes that "a utility can look to 18 C.F.R. § 35.35(d)(1)(vi), determine that its project is likely to meet the eligibility criteria, and rely on that expectation as motivation to proceed with the project." Pet'r Br. 45. Of course, broadly speaking, SDG&E is correct that the mere existence of the Incentive Rule is a general inducement to investment in transmission infrastructure. So, too, low home-mortgage rates generally encourage homebuyers. But not every applicant is automatically entitled to every generally available deal.

SDG&E is simply wrong that the Incentive Rule by itself "guarantees" any rate treatment or entitles a utility to any specific incentive. As the Rule's preamble squarely announces: "The Final Rule does not grant incentive-based rate treatments or authorize any entity to recover incentives in its rates. Rather, it informs potential applicants of incentives that the Commission is willing to allow when justified." Order No. 679, 116 FERC ¶ 61,057 at P20. The Commission expressly cautioned utilities that "not every incentive identified herein will be necessary or appropriate for every new transmission investment." *Id.* at P6; *see Pac. Gas & Elec. Co.*, 163 FERC ¶ 61,187 (recognizing Abandonment Incentive eligibility of some projects but not others).

*Second*, SDG&E argues that the Incentive Rule's recognition of two distinct procedural pathways for seeking Commission authorization for incentive rates means that the timing of a declaratory order that a utility seeks under the two-step option cannot affect the scope of eligibility for the Abandonment Incentive. As described above, a utility may apply for at least some of the incentives in a one-step process, by seeking a rate adjustment under Section 205 of the FPA. Or, the utility may follow a two-step procedure by first seeking a

declaratory order establishing its eligibility for one or more incentives, and later seeking a corresponding rate adjustment. *See* Order No. 679, 116 FERC ¶ 61,057 at PP76-79. SDG&E contends that the Commission's application of the nexus test conflicts with the Rule by effectively foreclosing applicants from seeking the Abandonment Incentive through a Section 205 rate order alone, thereby "nullifying that one-step procedural pathway." Pet'r Br. at 39. SDG&E observes that a utility could only conceivably apply for a determinate rate increase under Section 205 pursuant to the Abandonment Incentive after abandonment had in fact occurred, by which time it would have necessarily already gone ahead with the project without the hedge provided by that incentive. Thus, if the one-step procedural pathway means anything, SDG&E contends, it must—contrary to the challenged approach—assure recovery in the absence of any declaratory order and, *a fortiori*, cover pre-declaratory order costs.

Not so. Nothing in the Rule requires that both one-step and two-step pathways be equally appropriate for every type of incentive. SDG&E appears to be correct that the Abandonment Incentive is only available through the two-step pathway, which involves securing a declaratory order in advance and later, after project abandonment, petitioning for a rate under Section 205. That is because, in order to justify it as a spur to investment, the Abandonment Incentive will ordinarily need to be in place at the relevant time, when uncontrollable future risks would otherwise deter potential investors and put a risk premium on capital—*i.e.*, before the relevant costs have been successfully financed. *See* Policy Statement, 141 FERC ¶ 61,129 at P14. That reality does not, however, render the Incentive Rule's "one-step 'option' . . . no option at all." Pet'r Br. at 38. The one-step pathway can alone suffice where an applicant seeks rate treatment under the Accelerated Depreciation or Deferred Cost Recovery Incentive provisions,

*see* 18 C.F.R. § 35.35(d)(1)(v), (vii). And perhaps a Section 205 petition would suffice to enable an incumbent utility to recover CWIP or pre-commercial operations costs for its new construction. *See* 18 C.F.R. § 35.35(d)(1)(ii), (iii). While those incentives might also be secured by a declaratory order in advance of a Section 205 petition, they differ from the Abandonment Incentive to the extent that they do not operate as hedges against future risk followed by rate-based recovery only when and if that risk materializes.

*Third,* SDG&E contends that we must reject the Commission's approach because the Incentive Rule requires a showing of a nexus to "the project" as a whole, or the entire "transmission facilities" under development, rather than separately to the utilities' costs incurred before and after the declaratory order. *See* Pet'r Reply Br. 11-12. SDG&E points to the Incentive Rule's introductory language directing applicants to demonstrate how the package of incentives they seek is "tailored to address the demonstrable risks or challenges faced by the applicant in undertaking *the project*," 18 C.F.R. § 35.35(d) (emphasis added), and to the Abandonment Incentive subsection of the Rule, which refers to "*transmission facilities*," *id.* § 35.35(d)(vi) (emphasis added); *see* Pet'r Reply Br. 11. But SDG&E takes that language out of context. There is no conflict between the Rule's requirement that an applicant identify risks faced by its project or facilities as a whole, and the Commission's determination that the potential public benefit of the Abandonment Incentive supports applying it only prospectively. The Commission here did nothing at odds with the Incentive Rule's references to entire projects or facilities. It considered the full scope of SDG&E's request, assessed risks that the SOCRE project as a whole would have to be abandoned, and determined that further investment in the project would be encouraged by authorizing SDG&E, in the

event of such abandonment, to recover from ratepayers SDG&E's investments after the effective date of the order.

*Fourth*, SDG&E similarly contends that the declaratory order conflicts with the Incentive Rule by authorizing less than the "100 percent" recovery stated in 18 C.F.R. § 35.35(d)(vi). Despite the Rule's two references to "100 percent," however, it is obvious that the relevant subsections do not require an all-or-nothing approach. As already discussed, applicants often obtain packages of more than one incentive. If the Commission were to find a project eligible for rate-based reimbursement for CWIP, and for the Abandonment Incentive—each of which authorizes recovery of "100 percent of prudently incurred" costs, *see* 18 C.F.R. § 35.35(d)(1)(ii), (vi)—the Rule would not support a rate pursuant to the Abandonment Incentive that included 100 percent of the costs ratepayers had already been charged pursuant to the CWIP allowance. *See* Order No. 679, 116 FERC ¶ 61,057 at P166. The Rule's reference to the availability of rate authority for "100 percent" of costs simply cannot be read to demand all-or-nothing approvals, foreclosing authorization for something less where circumstances so demand.

Rather, the Commission grants incentive rate authority "when justified" on a "case-by-case basis" in orders tailored to the demonstrated needs of each project. *See* Order No. 679, 116 FERC ¶ 61,057 at P20; Order No. 679-B, 119 FERC ¶ 61,062 at P18. Indeed, the Incentive Rule "requires applicants to tailor their proposals to fit the facts of their particular case," Order No. 679, 116 FERC ¶ 61,057 at P5, such that "the incentive package as a whole results in [the] just and reasonable rate" mandated by the Rule, *id.* at P2. *See* 18 C.F.R. § 35.35(d) (requiring that the incentives be "tailored to address the demonstrable risks" of each project). These overarching requirements necessarily call on applicants to demonstrate

need, and they afford some flexibility to the Commission to limit the incentive-rate authority it grants to match that need. Just as the Incentive Rule's text permits the Commission to grant less than 100 per cent rate authority in order to reconcile multiple incentives, and to devise "other," case-specific incentives for worthy projects, *see* 18 C.F.R. § 35.35(d)(1)(viii), it contemplates that the Commission will tailor its grants of rate authority to particular features of an applicant's demonstrated needs.

*Finally*, we see no merit to SDG&E's argument that the Commission's treatment of the Abandonment Incentive in prior cases renders the orders below arbitrary and capricious. The dissent objects that FERC twice granted pre-order costs "without imposing the limitation it applied to San Diego." Diss. Op. 10 (citing *Pac. Gas & Elec. Co.*, 137 FERC ¶ 61,193 (2011), and *S. Cal. Edison Co.*, 137 FERC ¶ 61,252 (2011)). In those early Abandonment Incentive cases, the declaratory orders made no express determination regarding effective dates, and no party objected to the utility's recovery for the period at issue. *See Pac. Gas & Elec. Co.*, 123 FERC ¶ 61,067 (2008); *S. Cal. Edison Co.*, 121 FERC ¶ 61,168 (2007). Although it drew a slightly different line in *Pacific Gas & Electric*—at the application for rather than grant of the Abandonment Incentive declaratory order—FERC ultimately relied on the same basic logic it employed here to hold that costs already incurred were not recoverable. *See* 137 FERC ¶ 61,193 at PP 2, 19.

SDG&E also contends that several other cases in fact granted pre-order costs pursuant to the Abandonment Incentive. But in most of its cited cases, no party filed a protest objecting on this ground, as the Six Cities did here. *See, e.g., NextEra Energy Transmission W., LLC*, 154 FERC ¶ 61,009 (2016); *ALLETE, Inc.*, 153 FERC ¶ 61,296 (2015); *S. Cal.*

*Edison*, 137 FERC ¶ 61,252; *Pac. Gas & Elec.*, 137 FERC ¶ 61,193. We have previously held that, "[i]n the absence of protests," the Commission's decision to approve rate increases does not amount to "policy or precedent." *Gas Transmission Nw. Corp. v. FERC*, 504 F.3d 1318, 1320 (D.C. Cir. 2007); *see generally Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (quoting *Webster v. Fall*, 266 U.S. 507, 510 (1925)). The dissent's citation to *ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018), is not to the contrary. Diss. Op. 11. In *ANR Storage*, the Commission had attempted to distinguish its conflicting market-power determinations regarding two natural gas storage providers, each with "virtually indistinguishable" market power in the same market. *Id.* at 1025. The sole underlying issue was squarely presented and necessarily resolved by the agency. *Id.* at 1025-26. In the FERC cases cited by SDG&E, in contrast, the question whether pre-order costs were categorically available was neither contested nor necessarily resolved. What is more, in *NextEra Energy, ALLETE*, and *Southern California Edison*, the Commission did not discuss the pre-order cost issue in granting the Abandonment Incentive. *See NextEra Energy*, 154 FERC ¶ 61,009 at P27; *ALLETE*, 153 FERC ¶ 61,296 at P29; *S. Cal. Edison*, 121 FERC ¶ 61,168 at P71.

\* \* \*

Because the Commission's application of the Abandonment Incentive is consistent with the Rule and supported by substantial evidence, SDG&E's petition is denied.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, *dissenting*:

I will begin with a hypothetical.

The Federal Energy Regulatory Commission at the beginning of the year announces that any employee who provides exceptional service will be eligible for a cash award at year's end. During the year several employees provide what the agency deems exceptional service: these employees manage to convince a panel majority of the D.C. Circuit of a quite dubious proposition – namely, that the prospect of recovering 100 percent of an investment even if the project fails is not an incentive to invest.

In its annual awards ceremony, FERC adopts the reasoning it employed in the case before us. And so it passes over these employees although they have rendered exceptional service. Why? Because the employees have already performed. No need to provide them with a cash award. After all, the employees went the extra mile with no assurance of being deemed exceptional and receiving any award. *See* Maj. Op. 19–20.

There is no difference between this hypothetical and FERC's decision here and the treatment of this case in the lengthy majority opinion, an opinion confirming the adage that sometimes the more you explain it the less anyone can understand it.

The regulation at the center of this case is not complicated. A utility is entitled to recover "100 percent of prudently incurred costs of transmission facilities that are cancelled or abandoned due to factors beyond the control of the public utility." 18 C.F.R. § 35.35(d)(1)(vi).

Although the regulation provides for the recovery of all prudently incurred costs, FERC decided that San Diego Gas &

Electric could only recover some of those costs. According to FERC, the "Abandonment Incentive" applies only to costs the utility incurs after FERC has issued an order declaring the utility eligible for the incentive.

I will discuss three basic problems with FERC's decision. These are that the theory on which FERC relies is invalid; that the language of the regulation does not support the decision; and that FERC's ruling is an unexplained departure from its precedents. I will begin with the theory.

FERC's idea is that "incentives cease to be incentives if the action they are intended to promote has already occurred." *San Diego Gas & Elec. Co.*, 157 FERC ¶ 61,056, at P. 22 (Oct. 26, 2016) [hereinafter Rehearing Order]. The majority's opinion echoes this theme, citing "the 'obvious proposition' that the Commission 'will not, and cannot, create incentives to motivate conduct that has already occurred.'" Maj. Op. 17–18 (quoting *Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 289 (D.C. Cir. 2006)).[1] And so according to this theory San Diego did not need the Abandonment Incentive for the costs it incurred before FERC declared the utility eligible for the incentive.

The fallacy in this theory is its failure to recognize that FERC created the incentive when it promulgated the regulation

---

[1] In the case the majority quotes, the court recognized that incentive awards can apply to conduct that both pre- and post-dates the award. *See Me. Pub. Utils. Comm'n*, 454 F.3d at 288 (emphasis added) ("FERC reasonably concluded the adder does not *only* reward past action."); *id.* at 289 (emphasis added) ("Here, the RTO has yet to be approved and the adder does not reward *only* past conduct . . ..").

in 2006,[2] well before San Diego began incurring costs for its transmission project. As any economist knows, although incentives "must be known to the agent in advance of his choice," they need not be awarded in advance of the choice; rather, they function as "an offer" and "a discrete prompt expected to elicit a particular response." Kristen Underhill, *When Extrinsic Incentives Displace Intrinsic Motivation*, 33 Yale J. on Reg. 213, 223 (2016) (quoting Ruth W. Grant, *Strings Attached: Untangling the Ethics of Incentives* 43 (2012)); *see also* Aaron L. Nielson, *Sticky Regulations*, 85 U. Chi. L. Rev. 85, 93 (2018) ("Basic economics suggests that in evaluating a potential investment opportunity, a regulated party considers how likely it is that incentives will remain in place.").

The prompting effect is generated by the announcement of the incentive even if the ultimate award is conditioned on some later showing and paid after some or all of the performance. *See Pub. Serv. Comm'n of N.Y. v. FERC*, 589 F.2d 542, 553 (D.C. Cir. 1978) (emphasis added) ("In its programs to provide incentive for new expenditures the FPC has long been concerned with avoiding payment for expenditures 'sunk' *before the*

---

[2] In the years leading up to the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, investment in electric transmission projects declined "while the electric load using the nation's grid more than doubled," Promoting Transmission Investment Through Pricing Reform, 116 FERC ¶ 61,057, at P. 10 (July 20, 2006) [hereinafter Order No. 679], *order on reh'g*, 117 FERC ¶ 61,345 (Dec. 22, 2006), *order on reh'g*, 119 FERC ¶ 61,062 (Apr. 19, 2007). Utility companies constructing new transmission facilities faced substantial risks, not the least of which was that after expending considerable funds, the company would have to abandon the project for reasons beyond its control and could not recover its investment. The Energy Policy Act directed the Federal Energy Regulatory Commission to establish incentive-based rules in order to reduce such risks and encourage investment in transmission facilities. *See id.* at PP. 1–14.

*announcement of the incentive . . ..*"); Louis Kaplow, *An Economic Analysis of Legal Transitions*, 99 Harv. L. Rev. 509, 551 (1986) (discussing retroactivity in relationship to "the announcement date" of incentives).[3]

The majority opinion tries to skirt this problem. It points out that San Diego never offered evidence showing that it relied on the Abandonment Incentive in deciding to build its transmission facility. Maj. Op. 19–20. This is a red herring. Under the regulatory regime FERC established, San Diego had no obligation to provide such evidence. In the 2006 rulemaking on the incentive rules, FERC "reject[ed] arguments that an applicant must show that, but for the incentives, the expansion would not occur." Order No. 679, 116 FERC ¶ 61,057, at P. 48. FERC's final rule was instead "based on a clear directive from Congress that does not require an applicant to show that it would not build the facilities but for the incentives." *Id.* That directive in section 219 of the Federal Power Act, 16 U.S.C. § 824s, does not require "an individual showing of need by incentive applicants," Order No. 679, 116 FERC ¶ 61,057, at P. 53.

The majority opinion also relies on San Diego's statement that some of its pre-order costs were expended "without assurance of cost recovery." Maj. Op. 19. FERC went even further. It decided that San Diego's project was not "rationally related" to the incentive because the utility had no guarantee of recovering its costs. Rehearing Order, 157 FERC ¶ 61,056, at P. 17. There is irrationality here, but it is on the part of FERC

---

[3] Consider a common federal incentive: the tax deduction for charitable contributions. Announced decades ago by Congress, that incentive encourages contributions made before the taxpayer applies for the deduction in that year's return. *See* 26 U.S.C. § 170(a)(1); Stanley S. Surrey, *Tax Incentives as a Device for Implementing Government Policy*, 83 Harv. L. Rev. 705 (1970).

and the majority opinion. Lack of certain recovery does not render the regulation something other than an incentive. Even with respect to costs incurred after a FERC declaratory order, a utility cannot be certain that it will ultimately qualify for the 100 percent Abandonment Incentive. After all, the project may or may not be abandoned. Even then, there will still be the questions whether post-order costs were prudent and whether the later termination of the project resulted from factors beyond the utility's control.

The Abandonment Incentive grew out of a preexisting system under which FERC generally awarded 50 percent of all prudently incurred costs for abandoned facilities. *See New Eng. Power Co.*, 42 FERC ¶ 61,016, 1988 WL 243523 (Jan. 15, 1988), *reh'g granted in part on other grounds*, 43 FERC ¶ 61,285 (May 19, 1988). That system rested on FERC's longstanding policy of ensuring that utility investors are at least partially "shielded against risk of losses resulting from aborted projects," thereby decreasing their "cost of capital." *Id.* at *10 (quoting *New Eng. Power Co.*, 8 FERC ¶ 61,054, at P. 61,177 (July 19, 1979), *order on remand*, 10 FERC ¶ 61,279 (Mar. 26, 1980), *modified in part on other grounds, NEPCO Mun. Rate Comm. v. FERC*, 668 F.2d 1327 (D.C. Cir. 1981)). In other words, the prior system also operated as an incentive. It was, moreover, an incentive routinely awarded with respect to pre-order costs. FERC extended this incentive to cover 100 percent of costs for much the same reason, that is, "[t]o reduce the uncertainty associated with higher risk projects, thereby facilitating investment in these projects." Order No. 679, 116 FERC ¶ 61,057, at P. 155. FERC offers no reason to distinguish between these two incentives with respect to pre-order costs. To the contrary, at the time it promulgated the regulation in this case, FERC specifically called for its incentives to apply to costs that predated the rule itself by up to roughly one year. *Id.* at

P. 34. Such costs would, of course, have occurred entirely in advance of any order issued under the rule.

Tying eligibility for the Abandonment Incentive to the date of FERC's order is particularly arbitrary, given that the date of the order is untethered to the development of the transmission facility in question. The result is that the amount of an applicant's recovery will depend on FERC's caseload and its efficiency in issuing declaratory orders. Here, San Diego lost out on more than five months' worth of Abandonment Incentive costs for the period during which its petition was pending before the Commission. *See* Rehearing Order, 157 FERC ¶ 61,056, at PP. 1–3.

This brings me to the text of the regulation. The majority defers to FERC's interpretation. *See* Maj. Op. 17–18, 20. It presumably grants this deference pursuant to *Auer v. Robbins*, 519 U.S. 452, 461–63 (1997), without taking the necessary first step of identifying an ambiguity in the regulation.[4] The majority

_____

[4] The Supreme Court recently granted certiorari to consider whether to overrule *Auer*'s rule of deference to agency interpretations of ambiguous regulations. *See Kisor v. Wilkie*, No. 18-15, 2018 WL 6439837 (U.S. Dec. 10, 2018). This case demonstrates the perils of deferring to an agency's wayward interpretation of its own regulation. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–56 (2012); *see also Garco Constr., Inc. v. Speer*, 138 S. Ct. 1052, 1052–53 (2018) (Thomas, J., dissenting from the denial of certiorari); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1210–11 (2015) (Alito, J., concurring in part and concurring in the judgment); *id.* at 1211–13 (Scalia, J., concurring in the judgment); *id.* at 1213–25 (Thomas, J., concurring in the judgment); *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 615–16 (2013) (Roberts, C.J., concurring); *id.* at 616–26 (Scalia, J., concurring in part and dissenting in part). *See generally* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum. L.

does not take this step because the regulation is not in the least bit unclear.

Nothing supports FERC's distinction between pre- and post-order spending. The regulation and the preamble to it in the rulemaking are unambiguous. The text of the Abandonment Incentive shows that it applies on a project-to-project basis, regardless of when or how a utility seeks authorization from FERC. Thus, FERC "will authorize" a utility to recover "100 percent of prudently incurred costs of transmission facilities that are cancelled or abandoned due to factors beyond the control of the public utility," 18 C.F.R. § 35.35(d)(1)(vi), subject to the "facilities" satisfying the reliability test and the "project" satisfying the nexus test, *id.* § 35.35(d).[5]

In the face of this unambiguous directive – 100 percent – FERC granted San Diego some $15 million less than 100 percent of the costs of the project. FERC explained that it had a "policy that a public utility may only recover up to 50 percent of prudently incurred abandonment costs for costs that are incurred before the date of the order granting the incentives." Rehearing Order, 157 FERC ¶ 61,056, at P. 10. Except that is not the policy FERC promulgated in its regulation. Nothing in the text of the Abandonment Incentive suggests that "100 percent" means anything less than just that. And nothing in the

---

Rev. 612 (1996).

[5] The applicant must show (1) that "the facilities for which it seeks incentives either ensure reliability or reduce the cost of delivered power by reducing transmission congestion consistent with the requirements of section 219 [of the Federal Power Act]" and (2) that "the *total* package of incentives is tailored to address the demonstrable risks or challenges faced by the applicant in undertaking the project." *Id.*

text of the regulation gives FERC discretion to award something less than the full incentive once the requirements are met. Indeed, in response to comments during its rulemaking, FERC expressly declined to revise the regulation to include "gradations regarding . . . the amount of incentive approved." Order No. 679, 116 FERC ¶ 61,057, at P. 49. The Commission is bound by that choice unless and until it revises the Rule through additional notice-and-comment rulemaking. *E.g.*, *United States v. Nixon*, 418 U.S. 683, 695–96 (1974); *Clean Air Council v. Pruitt*, 862 F.3d 1, 8–9 (D.C. Cir. 2017) (per curiam).

The structure of the regulation also cuts against FERC's view. An applicant may seek a determination of its eligibility for incentives in two ways. As San Diego did here, an applicant may seek a pre-abandonment declaratory order, followed by a post-abandonment filing for a rate adjustment under section 205 of the Federal Power Act. 18 C.F.R. § 35.35(d). The regulation alternatively allows an applicant to forgo the declaratory-order step and instead seek eligibility and rate determinations simultaneously after abandonment. *Id.* An applicant who opts for this second procedural route by making only a post-abandonment filing would have incurred all of its costs in advance of FERC's order. Under FERC's policy of denying pre-order costs, then, the Abandonment Incentive would entitle such an applicant to 0 rather than 100 percent of its costs.

Even for those applicants seeking a declaratory order in advance of abandonment, under FERC's policy few if any will obtain the elusive 100 percent of costs called for by the Abandonment Incentive. In order to show that its project meets the regulation's substantive requirements of reliability and nexus, an applicant must necessarily have expended funds in planning and development. Those costs would pre-date the declaratory order and would therefore be excluded from the

Abandonment Incentive according to FERC's decision in this case.

FERC's counsel tries to escape the consequences of the administrative decision here by asserting that the agency is merely proceeding on a "case-by-case basis."[6] The assertion is either meaningless or capricious, even though the majority opinion seems to endorse it. If all it is intended to describe is the process of deciding cases, we already have a word for it – adjudication. On the other hand, it may signify that FERC has discretion to treat other applicants seeking pre-order costs differently than it treated San Diego. But an agency's discretion is not "inclination," but its "judgment; and its judgment is to be guided by sound legal principles." *United States v. Burr*, 25 F. Cas. 30, 35 (C.C.D. Va. 1807) (No. 14,692d) (Marshall, C.J.); *see also* Henry J. Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747 (1982). So what are the "sound legal principles" for FERC to allow or disallow 100 percent recovery of pre-order costs? FERC provided none in its adjudication of this case and neither has agency counsel.[7]

---

[6] *Auer* deference is especially unwarranted where, as here, the agency's interpretation is adopted post hoc as a litigating position and conflicts with its prior reasoning. *Christopher*, 567 U.S. at 155–56.

[7] The majority's recitation of FERC's rule adopts the categorical approach. *See* Maj. Op. 9–10 (noting that the Abandonment Incentive is available for costs "only insofar as those costs were incurred after the effective date of the order" and identifying that date as "the separating point between" eligible and ineligible costs). It ignores that FERC repeatedly renounced that position in this appeal. *See, e.g.*, Resp't Br. 12–13 ("But the Commission did no such thing. . . . [S]uch [pre-order] costs could be recovered if the applicant established the requisite nexus."); *id.* at 28 ("The Commission Did Not Bar All Retroactive Recovery"); *id.* at 30, 37.

In short, FERC's policy runs contrary to the text, structure, and purpose of the regulation. FERC's interpretation is not "fairly supported by the text of the regulation itself," and applicants lack "adequate notice of that interpretation . . . within the rule itself." *Drake v. FAA*, 291 F.3d 59, 68 (D.C. Cir. 2002); *accord Mellow Partners v. Comm'r*, 890 F.3d 1070, 1079 (D.C. Cir. 2018).

FERC's policy also departs from the agency's precedent. The majority's attempt to write off FERC's prior orders is contrary to the law of this circuit.

In *NextEra*, for example, the utility sought to recover an Abandonment Incentive of 100 percent of its prudently incurred costs, "including costs related to the Projects that have been incurred prior to the date of filing." *NextEra Energy Transmission W., LLC*, 154 FERC ¶ 61,009, at P. 13 (Jan. 8, 2016). FERC granted that request without any limitation with respect to pre-order costs. *Id.* at P. 26. FERC so ruled without engaging in any so-called case-by-case analysis of whether to award pre-order costs. *Id.* The majority opinion hypothesizes that FERC did not resolve the question of NextEra's pre-order costs. Maj. Op. 25–26. There is no indication in FERC's order to support that hypothesis: NextEra expressly sought an order with respect to those costs, and its request was granted without any relevant limitation. Still less was any explanation in FERC's order in this case about why it did not take such an approach with respect to San Diego. In at least two cases of actual abandonment, FERC has gone on to grant pre-order costs without imposing the limitation it applied to San Diego. *See S. Cal. Edison Co.*, 137 FERC ¶ 61,252, PP. 10, 24 (Dec. 30, 2011); *Pac. Gas & Elec. Co.*, 137 FERC ¶ 61,193, at PP. 4–5, 19 (Dec. 12, 2011).

The majority discounts these prior orders because "no party filed a protest objecting on this ground, as the Six Cities did here" and because the issue of pre-order costs was not specifically discussed. Maj. Op. 25–26. Our court has rejected this very argument. In *ANR Storage*, FERC attempted to distinguish its prior orders from the one under review on the basis that the former had been unopposed and lacked a reasoned discussion. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1025 (D.C. Cir. 2018). We held that FERC had failed to "satisfy [its] burden to provide some reasonable justification for treating [the utilities] differently." *Id.* FERC has a "statutory duty—imposed by the APA and owed to all *other* regulated parties—to provide some reasonable justification for any adverse treatment relative to similarly situated competitors." *Id.* FERC breached that duty here by imposing a new policy on San Diego without explaining its departure from prior orders.[8]

---

[8] *Gas Transmission*, cited by the majority, is not to the contrary. *See Gas Transmission Nw. Co. v. FERC*, 504 F.3d 1318, 1319–20 (D.C. Cir. 2007). In that case, we observed that FERC's acceptance of unopposed tariff sheets "does not turn every provision of the tariff into 'policy' or 'precedent.'" *Id.* at 1320. That narrow statement – not *every* provision – does not license FERC to apply its own rules inconsistently so long as it avoids explaining its actions.