# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 19, 2018      Decided December 28, 2018

No. 17-1275

EXELON CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Matthew E. Price* argued the cause for petitioner. With him on the briefs was *William K. Dreher*.

*Carol J. Banta*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was *Robert H. Solomon*, Solicitor. *Ross R. Fulton*, Attorney, entered an appearance.

Before: KATSAS, *Circuit Judge*, and SILBERMAN and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:  In a very very few cases, the dispute between the parties vanishes in the course of oral argument.  This case may be a variation of that pattern.  Agency counsel seemed to contend that the correct meaning of the challenged order was in conformity with the meaning that petitioner ascribed to the controlling statute.  Because the parties' dispute may be illusory, we remand the record to the agency to sort out what it really means.

\* \* \*

Petitioner Exelon, which owns a number of electric generation resources in New England, challenges the adoption by the Federal Energy Regulatory Commission of changes to the Transmission, Markets, and Services Tariff ("Tariff") proposed by the Independent System Operator for New England ("ISO-NE"), the non-profit entity overseeing organized wholesale power markets in that region.  The Tariff governs the annual Forward Capacity Auction in which energy suppliers contract to provide capacity three years in advance as part of the Forward Capacity Market.  FERC approved the proposed tariff changes, subject to certain conditions.  *ISO New England Inc.*, 155 FERC ¶ 61,029 (Apr. 12, 2016) ("*Final Order*").  The Commission then accepted ISO-NE's modified filing.  156 FERC ¶ 61,067 (Jul. 27, 2016).  Exelon sought rehearing, which FERC denied.  *ISO New England Inc.*, 161 FERC ¶ 61,115 (Oct. 30, 2017) ("*Rehearing Order*").  Exelon now seeks our review.

ISO-NE's proposed changes to its tariff sought to tackle the perceived risk that suppliers might exercise market power through improper use of ISO-NE's retirement options via "physical" or "economic" withholding.  In the first case, a multi-plant generator prematurely withdraws a unit from participation in the Forward Capacity Auction, thereby dampening supply, driving up prices, and enjoying higher

returns from other plants. Though a physical withholding, the retirement is "uneconomic" in the sense that the unit would be expected to remain profitable if it were not retired. See *Final Order* ¶ 7 n.8. In "economic" withholding, the supplier has a unit participate in the auction but sets an artificially high retirement "bid" when it has reason to believe that its capacity is needed for the market to clear, thereby nudging up the clearing price. In that case, of course, the unit would reap undue profits rather than retire. See Prepared Testimony of Jeffrey D. McDonald on Behalf of ISO New England Inc. (Dec. 17, 2015), Joint Appendix ("J.A.") 62–63. Each "bid" represents a "price below which a supplier does not wish to provide capacity from an existing resource[.]" *Final Order* ¶ 2.

Whereas before the disputed orders a unit could retire under a Non-Price Retirement Request without submitting a bid into the auction, see *Final Order* ¶ 2, all units wishing to retire must now submit such bids, see *id*. ¶¶ 6–7. Under the new rules, all retirement bids are reviewed by ISO-NE's Internal Market Monitor. *Id*. ¶ 7. The market monitor evaluates the "appropriateness" of the proposed bid after "consult[ing]" with the supplier as to the "reasonableness" of "cost assumptions" underlying its retirement bid. *Id*. If the monitor determines that certain cost items are unsupported, and the original bid exceeds the monitor's preferred price by more than 10% (the "materiality threshold"), the monitor will substitute a "mitigated bid" for the supplier's original bid. *Rehearing Order* ¶¶ 8, 15. All bids are submitted to FERC by ISO-NE in a filing under § 205 of the Federal Power Act, 16 U.S.C. § 824d. See Tariff § III.13.8.1(a), J.A. 40. If FERC approves the mitigated bid, then that bid will stand in—as a so-called "proxy bid"—for the capacity of the retiring resource. If the market clears at or above the proxy bid price, but below the supplier's original bid—that is, above what the market monitor thinks reasonable, but below what the supplier is willing to

accept—the auction is re-cleared to obtain the missing capacity from other suppliers. See *Rehearing Order* ¶ 6.

A supplier may acquiesce in the mitigated bid, though it must do so before ISO-NE's § 205 filing—and, *a fortiori*, before it knows the clearing price. See *Rehearing Order* ¶¶ 5, 20. In that event, presumably, the unit retires if the auction clears below the proxy bid.

Finally, the distinction between unconditional and conditional retirement needs explaining. If the market monitor decides to mitigate a bid, a supplier may opt to retire a unit *no matter what*—that is—unconditionally. See *Final Order* ¶ 61. If the owner of the unconditionally retiring unit owns multiple units, the monitor must carry out a "Portfolio Benefits Test" to assess whether "the resource owner's portfolio, as a whole, benefits from the retirement." *Id.* ¶ 8; see *Rehearing Order* ¶ 5. If a portfolio benefit exists, a proxy bid will be used, neutralizing the effects of a possibly uneconomic retirement.

A supplier knowing that a mitigated bid will be filed may choose to retire the relevant unit conditionally—i.e., contingent on the auction clearing price. If a supplier unsuccessfully protests a mitigated bid and a proxy bid is entered into the auction, three possibilities arise. (1) If the clearing price is *below* both the original bid and mitigated bid, the unit retires. (2) If the clearing price is *at or above* both bids, the supplier takes on a capacity obligation. (3) If the clearing price is *at or above* the mitigated bid but *below* the original bid, the unit must retire. See *Rehearing Order* ¶ 6.

Exelon protests ISO-NE's new tariff rules, arguing (among other things) that they trample on its § 205 rights. As Exelon reads FERC's orders, they mean that FERC vets the *market monitor*'s mitigated bid, which will be used in the auction if it is just and reasonable, whereas in the normal course (and as

required by law in Exelon's view) a *supplier*'s bid is vetted under that standard and would be entered in the auction if it passes. At the core of Exelon's objection is the apparent elimination of FERC review of the supplier's rate under the just and reasonable standard and its replacement with review of the monitor's bid.

\* \* \*

The parties seemingly had no shortage of disagreements before the agency and on appeal. At oral argument, however, it emerged that these skirmishes may have little practical import. Counsel for FERC suggested that FERC—despite approving the tariff rules over petitioner's objections—interprets them in a way that, practically speaking, largely squares with Exelon's view of its § 205 rights (even while FERC denies that Exelon has a right to § 205 review of the disputed class of bids).

Given this odd posture, here we endeavor to crystalize the apparent dispute (or harmony!) between the parties and remand the record. We do not resolve whether a supplier's retirement bids are "rates" under 16 U.S.C. § 824d(a), and therefore entitled to assessment by FERC under the "just and reasonable" criterion. See Exelon Br. 35–39. Nor do we pass on whether Exelon can rightly be said to have consented to the new rules by virtue of having participated in the 2006 Forward Capacity Market Settlement. See, e.g., FERC Br. 29; *Final Order* ¶ 85. Rather, we tee up the issues for prompt clarification by the Commission.

\* \* \*

While FERC does not contest standing, we have an "independent obligation to assure [ourselves] that standing

exists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). And we conclude that it does.

To show Article III standing, a party must satisfy the familiar three-part test: "(1) an injury in fact, (2) fairly traceable to the challenged agency action, (3) that will likely be redressed by a favorable decision." *Kansas Corp. Comm'n v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Exelon meets this standard.

The new rules are designed to enhance the power of the market monitor to challenge suppliers' bids, substituting mitigated bids where it thinks necessary. Use of a proxy bid under the tariff (as understood by Exelon) would generally lower the auction clearing price more than would a process operating under Exelon's view of the statutory requirements, thereby lowering the revenue of all suppliers whose capacity is needed to meet demand (except where a proxy bid leads to substitution of a higher-priced supplier or suppliers for the one whose bid has been mitigated, see Exelon Br. 21–22; see also *Final Order* ¶ 9). Thus, the disputed features of the new tariff rules would seem to cause an injury in fact.

But the harms to Exelon are even more particular. It owns up to a dozen plants in the ISO-NE region, Oral Argument at 16:12, including "some major plants [that] are nearing the end of their life," Oral Argument at 16:19. The new rules place Exelon in a vice. On the one hand, to avert a mitigated bid, Exelon might preemptively choose to shave its retirement bids. In that case, where its non-mitigated bid turns out to be the marginal one in the auction (i.e., sets the market clearing price), Exelon may receive less revenue than it would have under its reading of the law—even in situations where it keeps a plant in business. On the other hand, if Exelon's preferred bid is mitigated, it would suffer economic harm if the proxy bid

causes the auction to clear below a price at which Exelon believes it could economically sell capacity into the market. In such a case, FERC's treatment of the mitigated bid as controlling will, through the operation of FERC's rules, force Exelon out of a market in which it could otherwise have participated at a normal profit. See Exelon Br. 20–22. (In light of this injury, the fact that suppliers are "only required to remain in the FCM [Forward Capacity Market] at a price at or above [their] originally proposed Retirement Bid," *Final Order* ¶ 61, is true but beside the point).

Given the number and age of Exelon's plants, and the operation of ISO-NE's new tariff provisions, Exelon will be reasonably likely to suffer one of these distinct but related harms, which this court can plainly remedy. Exelon thus clears the bar of Article III's standing requirements.

* * *

Exelon's principal objection to the new tariff rules, which focuses on conditional retirement, is that they gut its § 205 rights. If retirement bids are "rates" under § 205, as Exelon claims, its bids are entitled to approval by FERC so long as they are just and reasonable. See 16 U.S.C. § 824d(a). Because there is a range of prices that can meet that standard, in the normal case even a bid towards the high end of the range will be accepted. By Exelon's reckoning, the new rules turn this standard on its head. Rather than submitting retirement bids to FERC in an informational filing as before, ISO-NE will now submit them in a § 205 filing, see Tariff § III.13.8.1(a), J.A. 40, so that *ISO-NE's bids*, including the market monitor's mitigated bids, which will obviously be lower than the supplier's, will be evaluated under the "just and reasonable" standard. In the case of a mitigated bid, then, the supplier is relegated to an inferior posture of having to protest this bid and—on Exelon's view—its bid will be used in the auction

only if it can convince FERC that the mitigated bid is unjust or unreasonable. This approach, on Exelon's account, triggers the economic harms described earlier. Exelon, alongside other parties, expressed its worry with perfect clarity:

> ISO-NE proposes a regime wherein the rate set by ISO-NE would be the only rate filed pursuant to FPA [Federal Power Act] § 205. If the Commission finds such a rate just and reasonable, then it must approve that rate, even if it finds that other rates—including one proposed through a protest filed by the generator itself—are themselves just and reasonable. As a result, the ability of public utilities to protest ISO-NE's proposed rates is cold comfort. Confining public utilities to protests to voice their views *as to their own rates* improperly places the burden on them to demonstrate that ISO-NE's proposed rates are unjust and unreasonable. That is neither lawful nor fair.

Protest of the GEN Group (Jan. 11, 2016), J.A. 91. As FERC's summaries indicate, it fully grasped petitioner's objections. See *Final Order* ¶ 79; see also *id*. ¶ 83.

To substantiate the above concerns, Exelon points to Paragraph 19 of FERC's Rehearing Order, which states in relevant part: "[A]s the proponent of the 205 filing, ISO-NE will bear the burden of proof to show that any proposed mitigated bids comply with ISO-NE's Tariff and are just and reasonable . . . ." See Exelon Br. 38–39; see also Oral Argument at 1:06:58. We agree with Exelon that this language appears to be incompatible with Exelon's understanding of its § 205 rights. See Oral Argument at 1:07:37 (COURT: "[Under Paragraph 19] the market monitor is substituted for the supplier for the operation of the 205 process." Counsel for Exelon: "Exactly . . . . That's the problem in our case. If the Commission is now suggesting otherwise, we are happy to

accept that concession . . . .").  If, under the new rules, FERC must approve a mitigated bid if it is just and reasonable, it presumably cannot also be the case that the *supplier's* original bid will be used in the auction if *it* is just and reasonable—as § 205 commands, according to Exelon.  A choice seems inevitable.

Where does FERC stand?  The orders and oral argument seem to point in contrary directions.  Prior to oral argument, one might have thought the Commission, while defending the change as lawful, tacitly conceded that the new rules shifted the legal burdens in the way Exelon depicts.  After all, despite ample opportunities, FERC never explicitly gainsaid Exelon's analysis of the new rules' operation.  FERC retorted instead that Exelon has no § 205 rights in retirement bids, either because such bids are not "rates," or because Exelon voluntarily ceded its rights in keeping with *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 10 (D.C. Cir. 2002) (observing that "utilities may choose to voluntarily give up, by contract, some of their rate-filing freedom under § 205").

Granted, FERC also repeatedly glossed the new rules as extensions of existing rules for other types of bids.  See *Rehearing Order* ¶ 15 (remarking that "[a]s noted in the April 12 Order, the tariff changes accepted in this proceeding will subject Retirement Bids to the same general Internal Market Monitor review process that previously applied to Static De-List Bids"); see also *Final Order* ¶ 85.  But, read alongside FERC's failure to disabuse Exelon of the idea that the market monitor's mitigated bids—rather than Exelon's bids—will now receive § 205 treatment, we took the dispute to be a live one.

Oral argument left us much less certain.  Counsel for FERC explicitly argued that the challenged orders—including Paragraph 19—should be read as consistent with Exelon's claim of entitlement to have its bids reviewed under § 205's just

and reasonable standard and to operate in the auction if they pass. The dispute, we were led to believe, is much ado over precious little.

To bolster its "nothing to see here" approach, counsel pointed to language arguably establishing that a mitigated bid can come into play only in the event of a FERC finding equivalent, even identical, to a finding that the supplier's bid failed the just and reasonable test. Specifically, counsel pointed to language in the Rehearing Order to the effect that the market monitor's role in mitigating bids is confined to cases where a supplier has "failed to support the reasonableness of particular cost items" underlying its bid. *Rehearing Order* ¶ 18; see also *Final Order* ¶ 58.

Far from resolving matters, however, this aspect of the new rules merely repackages the mystery. Petitioner may reasonably ask: If the monitor *erroneously* (in petitioner's view) deems a cost item to be unsupported and files a mitigated bid, how will the Commission respond?

True, suppliers have an "opportunity to protest" the market monitor's "determination." *Final Order* ¶ 70; see also *id.* ¶ 85; *Rehearing Order* ¶ 18. But if Exelon may successfully protest a mitigated bid only on a showing that it is unjust or unreasonable, this form of protest embodies, rather than dissipates, petitioner's concerns. The Commission will have outsourced to the market monitor what Exelon regards as FERC's statutory obligation to assess the reasonableness of retirement bids—including, presumably, discrete cost items. So Exelon's complaint is as firm as ever if a bid can be mitigated just because the *market monitor* thinks certain of the supplier's bid cost items are unsupported or unreasonable. If the Commission will only undo the monitor's error on a showing that the mitigated bid is unjust or unreasonable, Exelon's concerns will be borne out. As it argued to the

Commission, the latter will (as Exelon understood the rules) have "no leeway at all [to use the supplier's bid over the monitor's] if the IMM [Internal Market Monitor]-determined bid is within the zone of reasonableness." Request for Rehearing and Clarification (May 12, 2016), J.A. 203; see also *Final Order* ¶ 83. In its denial from rehearing, FERC registered the objection but again avoided a direct response. Indeed, Paragraph 19 of the Rehearing Order appears to allow the market monitor's bid to take effect in the auction if it is "just and reasonable," with no indication that a supplier's bid meeting that standard would prevail instead.

FERC counsel's view implicitly suggests a somewhat different model of the ultimate process. In cases where the market monitor disputes particular cost items, FERC might review Exelon's justifications for those items *de novo*, accepting each item so long as it is reasonable. FERC would then bless Exelon's original bid if all its supported cost items, together with other relevant factors, produce a bid within the zone of reasonableness. This scenario would provide Exelon with the functional equivalent of its being entitled to have its bid prevail by satisfying the Commission under § 205. It would, moreover, align with FERC's terse remark that the tariff changes do not "oblige the Commission to accept as just and reasonable an Internal Market Monitor-mitigated bid in lieu of a more accurate supplier-initiated bid," raising questions about how, exactly, "accuracy" is gauged. *Rehearing Order* ¶ 18; see also FERC Br. 32.

If something like the above approximates FERC's view, FERC's actions in the orders are puzzling. Why, for example, did the Commission not put to rest Exelon's misunderstanding of the new rules' implications in the Final Order or Rehearing Order? And what, precisely, is the point of the tariff's styling ISO-NE's bid submissions as "fil[ed] . . . pursuant to Section 205," Tariff § III.13.8.1(a), J.A. 40, if suppliers' original bids

in effect receive the equivalent of § 205 treatment in case of a mitigated bid?

Whatever the explanation, counsel for FERC seemed to endorse a protest method of a kind outlined two paragraphs above—which, to repeat, clashes with our reading of Paragraph 19 (though it appears consistent with the "accuracy" passage from Paragraph 18). See Oral Argument at 54:52 (COURT: "Suppose the market monitor identifies five cost items which it believes have not been adequately supported. And suppose the Commission look[ed] at all five claims . . . and . . . found one wasn't adequately supported and the other four were. Then what happens?" Counsel for FERC: "[The Commission] would go back to the supplier's cost items that were supported and put those back in . . . ." COURT: "So are you saying that what happens here is the exact equivalent of what happens when a rate is submitted and it is reviewed against various claims that it's not adequately supported . . . ?" Counsel for FERC: "If I'm understanding your question right, yes."); see also Oral Argument at 46:33 (COURT: "[I]f [FERC] Staff says reasonable [people] can differ as between . . . two bids[,] . . . who gets priority?" Counsel for FERC: "Well, if reasonable minds could differ . . . I think the supplier['s bid gets priority], because if the supplier is able to support the particular cost items in such a way that the Commission says, 'reasonable minds could differ, but you have supported your version,' then, yes, that's exactly what the Tariff says."); Oral Argument at 54:05 (COURT: "Where is the difference between the two of you, then? Did you suggest that the monitor's rate will not be accepted if the supplier's [bid] is just and reasonable?" Counsel for FERC: "If it [the supplier] has supported its cost items as required in the Tariff, yes. . . . The supplier can use their original bid if they have supported all of the cost items as required in the Tariff."). Bringing the orders into line with counsel's contentions would seem to require modifying Paragraph 19 to say the near opposite of what it now says.

Counsel did not seem to disagree. See Oral Argument at 1:10:27 (COURT: "[T]his sentence in Paragraph 19 is at best confusing and at worst mendacious, under your view, because it ought to read: 'But, as the proponent of a rate, the supplier will bear the burden of proof to show that its bid is just and reasonable.' Period, full stop." Counsel for FERC: "Right, but it can only be read in conjunction with Paragraph 18 and other parts of that order and the previous order that say the market monitor's bid is only compliant with the Tariff, it only is permissible under the Tariff, if two things are true [which counsel does not explain because of the next question]"; see also Oral Argument at 1:11:18 (COURT: "Would you have any objection to our ruling in your favor based on your representation to [the Court] that the words [we] read to you should be interpreted or rewritten to mean what [the Court] said [i.e.], it's not ISO's burden to show that the mitigated bid[s] comply with the Tariff and are just and reasonable but it's . . . the supplier's burden to show that its bid is just and reasonable[,] . . . [which is] necessary and sufficient for the bidder to prevail . . . ?" Counsel for FERC: "I think that's right.").

We see no way to skirt the question Exelon tees up: under ISO-NE's new tariff rules, does a supplier's rate enter the auction so long as it convinces the Commission that the rate is just and reasonable, over contrary claims of the market monitor? If the Commission accepts the modification to Paragraph 19 that counsel seemingly endorsed—and enters other appropriate changes to its orders in keeping with that modification—the dispute between the parties may dissipate, or even vanish.

To resolve the mystery, we remand the record to FERC. In light of the March 2019 submission window for retirement bids for the 2020 Forward Capacity Auction, see ISO-NE, Forward

Capacity Auction #14 Schedule (rev. Mar. 1, 2018), https://www.iso-ne.com/static-assets/documents/2017/05/fca-14-timeline-5-9-2017.pdf, FERC should issue its clarification expeditiously, and in no event later than February 1, 2019.

*So ordered*.