# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 21, 2021          Decided June 17, 2022

No. 19-1224

BELMONT MUNICIPAL LIGHT DEPARTMENT, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MAINE PUBLIC UTILITIES COMMISSION, ET AL.,
INTERVENORS

Consolidated with 19-1247, 19-1252, 19-1253

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

*John P. Coyle* argued the cause for petitioners New England Consumer-Owned Systems. With him on the briefs was *Ashley M. Bond.*

*Christopher G. Aslin*, Senior Assistant Attorney General, Office of the Attorney General for the State of New Hampshire, argued the cause for State petitioners. On the briefs were *John M. Formella*, Attorney General, *Daniel E. Will*, Solicitor

General, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, and *Timothy J. Reppucci*, Assistant Attorney General at the time the briefs were filed. *Christina Belew*, Assistant Attorney General, entered an appearance.

*Casey A. Roberts* argued the cause for petitioners Sierra Club and Union of Concerned Scientists. With her on the briefs was *Charles Carter Hall* at the time the briefs were filed. *Devin McDougall* entered an appearance.

*Robert M. Kennedy*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Paul W. Hughes* argued the cause for intervenor New England Power Generators Association, Inc. in support of respondent. With him on the brief were *David G. Tewksbury* and *Andrew A. Lyons-Berg*.

*Michael J. Thompson* and *Maria Gulluni* were on the brief for intervenor ISO New England Inc. in support of respondent.

Before: WILKINS, KATSAS and JACKSON[*], *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

---

[*] Judge Jackson was a member of the panel at the time the case was argued but did not participate in the disposition of this matter.

WILKINS, *Circuit Judge*: The Northeast region of the United States will likely face fuel energy security risks in upcoming winters because of the stress the winter places on its electricity grid. When the system is stressed, power plants struggle to secure the fuel they need to produce energy. As a result, emergency actions, such as rolling blackouts, become necessary to protect the power grid. To mitigate these impending risks, the Independent System Operator for New England ("ISO-NE") took action.

**I.**

In May 2018, pursuant to Section 205(d) of the Federal Power Act ("FPA"), 16 U.S.C. § 824d(d), ISO-NE filed tariff revisions with the Federal Energy Regulatory Commission ("FERC" or "the Commission") to compensate generators for maintaining an inventory of energy during the winter months of 2023–24 and 2024–25. The revisions implemented the Inventoried Energy Program ("IEP"), under which ISO-NE will provide additional payments to generators to maintain up to three days' worth of fuel on-site and convert it into electricity. ISO-NE's objective is to incent market participants to acquire more inventoried energy than they otherwise would and compensate these resources for improving winter energy reliability.

On June 18, 2020, the Commission issued an order accepting ISO-NE's proposed tariff revisions. *ISO New Eng. Inc.*, 171 FERC ¶ 61,235 (2020) ("Order Accepting Tariff Revisions"). FERC concluded that IEP is a just and reasonable interim solution to address the Northeast region's fuel security risk while ISO-NE continues working on a long-term market design solution. Order Accepting Tariff Revisions ¶¶ 2, 34. The Secretary of the Commission issued notices denying

requests for rehearing by operation of law. *ISO New Eng. Inc.*, 172 FERC ¶ 62,095 (2020) ("August 2020 Notice").

We consider four timely Petitions for Review challenging FERC's Order accepting ISO-NE's proposed tariff revisions. Petitioners include New England Consumer-Owned Systems ("NECOS"), a group of municipally-owned electric utilities and a municipal light plant cooperative owned by five municipal electric utilities; the New Hampshire Office of the Consumer Advocate, the New Hampshire Public Utilities Commission, and the Attorney General of the Commonwealth of Massachusetts (collectively, "State Petitioners"); and Sierra Club and Union of Concerned Scientists (collectively, "Environmental Petitioners"). Petitioners contend that FERC's decision to approve IEP imposes unjust and unreasonable, discriminatory, and preferential rates.

Importantly, many market participants that ISO-NE has proposed to compensate under IEP—namely nuclear, hydroelectric, coal, and biomass generators—already maintain "inventoried energy," meaning that their standard operating practice is to store more than three days' worth of fuel on-site. J.A. 12–13, 19, 356, 539. As such, IEP is designed to compensate these market participants for maintaining the status quo, not incent them to change their behavior to further improve cold weather fuel security in New England. J.A. 11.

Furthermore, IEP's compensation scheme is similar to that of a previous winter energy security program proposed by ISO-NE: the Winter Reliability Program. *See ISO New Eng., Inc.*, 154 FERC ¶ 61,133 (2016) ("Order Denying Rehearing"). In July 2015, ISO-NE and New England Power Pool Participants Committee ("NEPOOL") submitted two alternative proposals to increase energy reliability during the winters between 2015 and 2018. *Id.* ¶ 5. In 2016, the Commission issued an order

accepting NEPOOL's proposal and rejecting ISO-NE's proposal to include coal, nuclear, and hydroelectric resources in the Winter Reliability Program because "substantial expert testimony" supporting NEPOOL's proposal reflected that coal, nuclear, and hydroelectric "resources are not likely to change their behavior in response to the particular payments outlined in the ISO-NE Proposal." *Id.* ¶ 13. The Commission reasoned that "the purpose of the Program is to incentivize additional reliability services to ensure reliability during the winter months." *Id.* ¶ 11. "We are not persuaded by [the] argument that nuclear, coal, and hydro resources are similarly situated with respect to the Winter Reliability Program merely because they are capable of storing on-site fuel." *Id.* ¶ 13. "Because the purpose of the Program is to ensure reliability during the winter, we do not find it necessary to include resources that do not provide any additional benefit to winter reliability for the sake of fuel neutrality alone." *Id.* All in all, FERC determined that ISO-NE's proposed compensation scheme was inappropriate because it would award windfall payments to nuclear, coal, and hydroelectric generators.

The Commission's precedent regarding the Winter Reliability Program is instructive to the resolution of the petitions before us now. Like ISO-NE's Winter Reliability Program, IEP is "fuel neutral"; it is designed to compensate *all* eligible market participants, including nuclear, coal, biomass, and hydroelectric generators, without any assurance that this group of generators will improve winter energy reliability. Despite evidence in the administrative record indicating that IEP's payment framework would award a windfall to nuclear, coal, biomass, and hydroelectric generators, FERC approved their inclusion in IEP and abandoned the position it previously took in the Order Denying Rehearing.

For the reasons discussed below, we find that pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Commission's approval of IEP was arbitrary and capricious in only one respect—its inclusion of coal, hydroelectric, biomass, and nuclear generators. FERC's acceptance of ISO-NE's proposal to compensate these market participants—despite record evidence that they would not change their behavior in response to payments—was not reasoned decisionmaking. The Commission's decision also conflicts with its past precedent on ISO-NE's Winter Reliability Program proposal. Accordingly, we partially vacate the Commission's June 18, 2020 order. We will sever the portion of the Inventoried Energy Program that is arbitrary and capricious: the program's inclusion of nuclear, biomass, coal, and hydroelectric generators.

This Court has jurisdiction under 16 U.S.C. § 825*l*(b). For the reasons explained below, the Petitions for Review are granted in part and denied in part.

## II.

FERC is an independent regulatory commission within the Department of Energy. Pursuant to the FPA, the Commission has exclusive jurisdiction to "regulate[] the sale of electricity at wholesale in interstate commerce." *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 41 (2003) (citing 16 U.S.C. § 824(b)). The FPA "empowers FERC to regulate the sale and transmission of electricity to ensure that electricity is provided at a 'just and reasonable' rate." *New England Power Generators Ass'n v. FERC*, 881 F.3d 202, 205 (D.C. Cir. 2018) ("*NEPGA*") (quoting 16 U.S.C. § 824d(a)). FERC retains jurisdiction over "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy." 16 U.S.C. § 824d(a). Under Section 205 of the FPA, a negatively affected party can

challenge a rate by filing a complaint with FERC. If the challenging party establishes that the existing rate has become unjust or unreasonable and FERC agrees, then Section 206 of the FPA authorizes FERC to establish a new rate. *NEPGA*, 881 F.3d at 205 (citing 16 U.S.C. §§ 824e(a), (b)).

**A.**

As indicated, ISO-NE, a non-profit entity, operates the Northeast's transmission services by running auction markets for energy. We assume familiarity with ISO-NE's administration of New England's wholesale electric markets. *See, e.g.*, *NextEra Energy Res., LLC v. FERC*, 898 F.3d 14, 17 (D.C. Cir. 2018) ("The features of ISO New England's complex forward capacity market have been the subject of multiple petitions for review."); *NEPGA v. FERC*, 881 F.3d 202 (D.C. Cir. 2018); *Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017); *TransCanada Power Marketing Ltd. v. FERC*, 811 F.3d 1 (D.C. Cir. 2015); *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203 (D.C. Cir. 2011).

ISO-NE conducts an annual forward capacity auction, whereby distributors pay electricity suppliers for their electricity production capacity three years into the future. *NEPGA*, 881 F.3d at 205. This annual Forward Capacity Market ("FCM") auction guarantees future electricity capacity in New England. *Id.* As this Court has previously explained:

> In the forward capacity market, local utilities contract with generators to buy quantities of energy three years ahead of their energy needs. With three years' notice, demand in the forward capacity market is able to signal that a new entrant is needed while there is still time to develop additional generation capability. ISO

> New England sets prices in the forward capacity market by administering a forward capacity auction. First, ISO New England determines the projected amount of capacity ("Installed Capacity Requirement") that the region will require to operate reliably in three years. Next, ISO New England holds a descending price auction, in which generators submit offers to provide quantities of power at certain prices, three years in the future. If the bid capacity at a given price exceeds the Installed Capacity Requirement, ISO New England lowers the auction price. As the auction price decreases, generators offer less capacity to the auction or exit the auction altogether. A "clearing price" is reached at the lowest price that yields enough supply to meet the Installed Capacity Requirement set by ISO New England. All generators that have successfully bid in the auction are paid the clearing price for the capacity they provide, even if they submitted a bid lower than the eventual clearing price.

*NextEra Energy Res.*, 898 F.3d at 17; *see also NEPGA*, 881 F.3d at 206. Under the FPA, FERC regulates the FCM auction: ISO-NE administrates the auction consistent with rules set out in a jurisdictional tariff approved by FERC. *NextEra Energy Res.*, 898 F.3d at 17; *NEPGA*, 881 F.3d at 205.

**B.**

IEP is not ISO-NE's first foray into addressing New England's winter energy security risk. Before developing IEP, ISO-NE undertook other efforts to mitigate the region's pervasive fuel security issues. For example, between the

winters of 2013–14 and 2017–18, ISO-NE operated the Winter Reliability Program, whereby ISO-NE compensated oil and natural gas generating resources to secure firm winter fuel supplies and provide load incremental benefits in terms of available energy. Order Accepting Tariff Revisions ¶ 48. The Winter Reliability Program, which is now defunct, was aimed at incremental fuel procurement. *Id.* ¶ 62. As mentioned, in a previous order concerning the Winter Reliability Program, FERC rejected ISO-NE's "technology-neutral" proposal to compensate market participants even if payments would not incent them to provide any additional benefit to winter reliability. *See generally* Order Denying Rehearing.

## C.

Meanwhile, in January 2018, ISO-NE prepared an Operational Fuel Security Analysis to better understand New England's impending winter energy security risks. The Operational Fuel Security Analysis reflects that under a variety of generation resource combinations, the possibility of energy shortfalls will become acute by the winter of 2024–25 and could materialize even earlier. J.A. 678–79, 706. In the event of energy shortfalls, ISO-NE must undertake energy conservation efforts, such as rolling blackouts, to keep the power flowing. During cold snaps, the region generally relies on power from coal, oil, and nuclear power plants, but economic pressures have caused many of these plants to close. J.A. 686. According to FERC, since 2013, 7,000 megawatts of coal, oil, and nuclear generators have retired or have announced plans for retirement in the coming years. Resp. Br. 14. ISO-NE projects that another 5,000 megawatts of oil and coal generating facilities are projected to retire. J.A. 355, 506. In total, there are currently about 31,000 megawatts of generation capacity. Resp. Br. 15 (citing Key Grid and Market Stats – Resource Mix, ISO New England Inc., https://www.iso-

ne.com/about/key-stats/resource-mix) (last updated Jan. 18, 2022)).

In March 2018, Exelon Generation Company LLC announced its decision to retire two generators, the "Mystic" units, which serve the greater Boston area. Order Accepting Tariff Revisions ¶ 3. Following this announcement, in May 2018, ISO-NE petitioned the Commission for a waiver of certain tariff provisions so that it could enter into cost-of-service agreements to keep the Mystic units online for the winters of 2022–23 and 2023–24. In July 2018, although it recognized that New England faces a serious fuel security risk, the Commission denied ISO-NE's petition, and directed ISO-NE to file tariff revisions that would implement cost-of-service agreements that address short-term fuel security concerns associated with the retirement of the Mystic units and improve the market design in New England to better address fuel energy security risks. In response to the July 2018 order, ISO-NE proposed fuel security cost-of-service provisions that would allow for the retention of resources for fuel security under a short-term, cost-of-service agreement. In December 2018, the Commission approved ISO-NE's proposed tariff revisions, and also accepted the cost-of-service agreement in connection to the Mystic units.

In June 2018, ISO-NE carried out Pay-for-Performance. Under Pay-for-Performance, ISO-NE compensates generators for energy when generating reserves are scarce, subjects generators to significant monetary penalties if they fail to meet their capacity performance obligations when energy is in high demand, and gives additional revenue to generators that over-perform relative to their obligations. Resp. Br. 71–72.

On March 25, 2019, pursuant to Section 205 of the FPA, ISO-NE filed proposed tariff revisions to implement IEP, an

interim solution to New England's winter energy security issues. Under IEP, ISO-NE pledged to compensate electric generators that maintain "inventoried energy," meaning stockpiles of fuel, during the winters of 2023–24 and 2024–25. ISO-NE designed IEP to mitigate the risk of generators being unable to get the fuel they need to meet consumer demand when the energy system is stressed during cold periods. In support of IEP, ISO-NE relied on the testimony of Dr. Christopher Geissler, an economist in ISO-NE's Market Development Department, and Dr. Todd Schatzki, an economic consultant ISO-NE hired to assist with rates and cost estimates associated with IEP. ISO-NE did not conduct a new energy security analysis to back IEP. Rather, it relied on the 2018 Operational Fuel Security Analysis. ISO-NE determined that it was appropriate to forgo additional analysis because the next forward capacity auction was scheduled for February 2020 and the circumstances called for swift action.

During the agency proceeding, ISO-NE argued that the Commission should approve IEP because unlike past solutions and efforts, IEP uniquely addresses a misaligned incentive problem in New England's regional energy market design. According to FERC, individual generators are not incentivized to maintain additional fuel on-site because of high up-front costs, even though doing so is a cost-effective mitigation against high energy prices and potentially catastrophic reliability risks. Resp. Br. 22. Because such fuel arrangements reduce the market price for energy, individual generators face a lower return on their investment. *Id.* IEP aims to address this problem by compensating generators that provide inventoried energy. In the FERC proceedings, ISO-NE represented to FERC that IEP's compensation scheme may motivate generators to arrange for more fuel at the start of winter, or as their inventory is depleted, and reduce generator retirement risks because compensation received through the program

reduces the amount of revenue generators must recover through the capacity markets to meet their going-forward costs.

Any generator may participate in IEP so long as it meets three key requirements: its fuel inventory (1) can be converted to electricity at ISO-NE's direction; (2) is reduced after conversion to electricity; and (3) can be measured by the participant and reported daily. These criteria enable oil, coal, hydroelectric, and nuclear generators to participate, whereas wind, solar, and natural gas-fired generators are only eligible if other conditions are met. J.A. 19–20. As mentioned, the administrative record reflects that ISO-NE's fuel neutral compensation scheme will not incent certain market participants—coal, nuclear, biomass, and hydroelectric generators—to procure additional fuel or otherwise improve winter energy reliability because these entities already maintain more than three days' worth of fuel on-site. J.A. 12–13, 19, 356; *see also ISO New Eng., Inc.*, 171 FERC ¶ 61,235, 62,732 (2020) ("Dissent from Order Accepting Tariff Revisions").

ISO-NE's proposal provides that IEP will cost between $148 million per year for 1.8 million megawatt hours of inventoried energy if natural gas generators can fully participate and $102 million per year for 1.2 million megawatts of inventoried energy if natural gas generators do not participate.

**D.**

On August 6, 2019, FERC issued a notice stating that the Commission lacked a quorum and could not act on ISO-NE's proposal. *ISO New Eng., Inc.*, FERC Docket No. ER19-1428-001 (August 6, 2019) ("August 2019 Notice"). As a result, ISO-NE's proposed tariff revisions went into effect by

operation of law and requests for rehearing were also denied by operation of law. *Id.* Petitioners sought judicial review, and in the meantime, FERC regained a quorum and sought a voluntary remand of the agency record so it could address ISO-NE's filing on the merits.

On June 18, 2020, the Commission issued a merits order accepting ISO-NE's proposed tariff revisions. Order Accepting Tariff Revisions ¶ 2. FERC reasoned that IEP is "a reasonable short-term solution to compensating, in a technology-neutral manner, resources that provide fuel security." *Id.* ¶ 32. FERC agreed with ISO-NE that there exists a "misaligned incentives problem"—that is, under current conditions, fuel secure resources may not be incentivized to make additional investments in energy supply arrangements, and this could cause adverse efficiency and reliability consequences. *Id.* ¶ 33 (internal quotation marks omitted). According to FERC, IEP addresses this problem by providing additional compensation to fuel secure resources and thereby offsetting the misaligned incentives in the market, while ISO-NE continues developing a long-term market solution.

Petitioners challenged the program during the agency proceeding on the grounds that ISO-NE failed to meet its burden, under Section 205 of the FPA, to demonstrate that IEP is just and reasonable and not unduly discriminatory or preferential. For instance, NECOS argued that ISO-NE represents that IEP "'may' incent resources to take actions that they otherwise would not take, but it does not explain how that claimed incentive would work with such resources." Order Accepting Tariff Revisions ¶ 42. NECOS also contended that there was no evidence that any of the types of generator resources targeted by IEP are even likely to retire. NECOS and the State Petitioners further reasoned that IEP unfairly compensates resources that are unlikely to change behavior.

14

*See id.* ¶ 48 ("New Hampshire Parties argue that the Inventoried Energy Program is unjust and unreasonable because it would result in additional compensation being paid to certain resources"—including nuclear, coal, biomass, and hydroelectric generators—"to provide energy to the system that those resources already provide in the normal course of their operations in response to wholesale market prices."). Petitioners also challenged IEP because ISO-NE failed to demonstrate how it would benefit consumers or why its high costs were justified, because IEP would result in discriminatory and preferential rates, and because it arbitrarily excludes most renewable resources. Accordingly, based on these various grounds, complainants participating in the agency proceeding asked the Commission to reject ISO-NE's proposal.

In the June 2020 order, FERC addressed the arguments Petitioners raised in their requests for rehearing of the August 2019 Notice. The Commission ultimately disagreed with Petitioners' arguments and determined that IEP is just and reasonable. FERC took no issue with ISO-NE's failure to demonstrate a need for IEP with a detailed cost-benefit analysis based on its determination that such an analysis was not required. In relevant part, FERC explained that IEP is a short-term measure that resolves fuel security concerns presented in the 2018 Operational Fuel Security Analysis by compensating fuel-secure resources.

With respect to the argument that IEP unfairly compensates generators that are unlikely to be incentivized to change behavior or provide a reliability benefit, the Commission summarily determined that "it is just and reasonable to provide similar compensation for similar service." *Id.* ¶ 62. FERC distinguished IEP from previous winter energy risk-mitigation efforts, such as Pay-for-Performance and the Winter Reliability Program, reasoning

that IEP "is aimed at compensating resources for a specific reliability attribute for which they are not currently compensated to address the misaligned incentives problem that ISO-NE identified." *Id.* The Commission went on to explain that

> Unlike the winter reliability programs, the Inventoried Energy Program includes a forward component that will allow resources to account for the program's revenue in making retirement and other de-list bid decisions. Accordingly, we find it just and reasonable for the program to allow broader eligibility. Moreover, we disagree with NECOS that approval of the Inventoried Energy Program is problematic because the incentives are not "reasonably calibrated to the behavior sought to be induced by the incentives." As we note above, we agree with ISO-NE that the current market design contains a misaligned incentives problem, such that fuel secure resources may not be sufficiently incented to make additional investments in energy supply arrangements, which may have adverse efficiency and reliability consequences under the existing market rules. However, we find that, by providing additional compensation to fuel secure resources, the Inventoried Energy Program is a short-term solution that helps address the misaligned incentives problem that currently exists in the Tariff.

*Id.* The Commission thus concluded that the program reasonably makes compensation incentives available to a variety of generators that can provide inventoried energy; is

designed to motivate generators contemplating retirement to stay in the market; and could increase the likelihood that financially secure generators will maintain adequate fuel supplies during periods of system stress. Commissioner Glick dissented and reasoned that he was "troubled by the evidence in the record that the program will hand out tens of millions of dollars to nuclear, coal, and hydropower generators without any indication that those payments will cause the slightest change in those generators' behavior." Dissent from Order Accepting Tariff Revisions ¶ 1. "Handing out money for nothing is a windfall, not a just and reasonable rate." *Id.*

On August 20, 2020, requests for the rehearing of the June 2020 order were denied by operation of law. *See* August 2020 Notice. Many complainants who challenged ISO-NE's IEP proposal in the agency proceeding—NECOS, State Petitioners, and Environmental Petitioners—petitioned for judicial review of FERC's June 2020 order as well as the other notices.

**III.**

Section 205 of the FPA, codified at 16 U.S.C. § 824d, "confers upon FERC the duty to ensure that wholesale energy rates and services are just and reasonable." *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 348 (D.C. Cir. 2014) (citing 16 U.S.C. § 824d(a)). "No public utility under FERC's jurisdiction may 'make or grant any undue preference or advantage to any person or subject any person or subject any person to any undue prejudice or disadvantage' in establishing rates." *Id.* (quoting 16 U.S.C. § 824d(b)). Furthermore, section 205 "requires regulated utilities to file with the Commission tariffs outlining their rates for FERC's approval." *Id.* (citing 16 U.S.C. § 824d(c)). As the filing utility, ISO-NE bore the burden of showing that the rates were just and reasonable. 16 U.S.C. § 824d(e).

"The statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition, and we afford great deference to the Commission in its rate decisions." *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 532 (2008). "Due to practical challenges and myriad divergent interests, FERC must be given the latitude to balance the competing considerations and decide on the best resolution in its regulation of electricity markets." *NEPGA*, 881 F.3d at 210 (internal quotation marks and citation omitted). Furthermore, "Congress has entrusted the regulation of the electricity industry to FERC, not to the courts." *Id.* (internal quotation marks and citation omitted). "Therefore, a presumption of validity . . . attaches to each exercise of the Commission's expertise." *Id.* (internal quotation marks and citation omitted).

Nevertheless, "[w]hile afforded wide latitude in ratesetting due to its expertise and broad statutory mandate, FERC—like all agencies—must engage in reasoned decisionmaking" mandated by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *NEPGA*, 881 F.3d at 210. The Administrative Procedure Act's arbitrary-and-capricious standard "requires the agency to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Commission's factual findings will be upheld if supported by substantial evidence. 16 U.S.C. § 825*l*(b).

Moreover, "[i]t is well established that the Commission must respond meaningfully to the arguments raised before it." *NEPGA*, 881 F.3d at 210 (internal quotation marks and citations omitted). In addition, "[i]t is textbook administrative

law that an agency must provide a reasoned explanation for departing from precedent or treating similar situations differently." *Id.* (cleaned up). To be sure, FERC "need not demonstrate to a court's satisfaction that the reasons for [a] new policy are *better* than the reasons for the old one," but the Commission must "ordinarily . . . display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* "Although case-by-case adjudication sometimes results in decisions that seem at odds but can be distinguished on their facts, it is the agency's responsibility to provide a reasoned explanation of why those facts matter." *NEPGA*, 881 F.3d at 211.

## A.

"While FERC does not contest standing, we have an 'independent obligation to assure ourselves that standing exists.'" *Exelon Corp. v. FERC*, 911 F.3d 1236, 1240 (D.C. Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)) (alteration accepted). In this case, we conclude that it does. Article III standing is both a constitutional and statutory requirement for reviewing the petitions in this case. "As a constitutional matter, we must assure ourselves that this is the type of dispute susceptible of judicial resolution and appropriate for the exercise of judicial power." *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1077 (D.C. Cir. 2017). "As a statutory matter, the Federal Power Act affords judicial review only to those parties 'aggrieved' by an order issued by FERC, 16 U.S.C. § 825*l*(b), and a party is 'aggrieved' only if it has Article III standing." *Id.* (citation omitted).

To establish Article III standing, Petitioners must satisfy a familiar three-part test:  (1) "an injury in fact"; (2) "fairly traceable to the challenged agency action"; (3) "that will likely be redressed by a favorable decision." *Kansas Corp. Comm'n v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Where there are multiple plaintiffs who assert overlapping arguments, at least one petitioner must have standing to seek each form of relief requested in the petitions for review. *Nat'l Ass'n of Regul. Util. Commissioners v. FERC*, 964 F.3d 1177, 1184 (D.C. Cir. 2020).  Here, both NECOS and the State Petitioners have standing.  First, NECOS has established an imminent injury-in-fact because it represents eighteen electrical utilities that will be expected to pay ISO-NE's designated rates under IEP and a municipal lighting plant cooperative that was a party to the proceedings before FERC. *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1367 (D.C. Cir. 2004); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5–9 (D.C. Cir. 2017).  Next, State Petitioners have established an imminent injury-of-fact because they represent the interests of the states in protecting their citizens and electric ratepayers in the traditional government field of utility regulation. *Maryland People's Counsel v. FERC*, 760 F.2d 318, 321 (D.C. Cir. 1985).  With respect to the causational element of Article III standing, these imminent injuries are traceable to FERC's approval of IEP.  Ordering the relief sought—granting their petitions, vacating FERC's approval of ISO-NE's tariff provisions implementing IEP, and remanding to the Commission—would redress their imminent injuries by maintaining the status quo with respect to the Northeast's electricity rates.  We conclude that NECOS and the State Petitioners have established Article III standing, and so we need not address whether the Environmental Petitioners also have standing.

**B.**

Next, we consider the merits of the petitions. Petitioners challenge several aspects of IEP. We reject all of the challenges except one.

Most broadly, Petitioners attack IEP itself. Among other things, they contend that it does not effectively address a pressing fuel security risk, that it unnecessarily duplicates other programs addressed to fuel security in New England, and that its total costs are unreasonable. We find the Commission's reasoning on these points to be adequate, and so we reject these challenges.

Petitioners fare better in their narrower challenge to one aspect of IEP—that it "adds approximately $40 million per year in new payments to nuclear, coal, biomass, and eligible hydroelectric resources notwithstanding that these resources are unlikely to change their behavior in response to these payments." NECOS Opening Br. 23.

FERC failed to respond adequately to this argument, most notably the concern that IEP will not incentivize nuclear, coal, biomass, and hydroelectric resources to change their standard practices. *See PSEG Energy Res. & Trade LLC*, 665 F.3d at 208. Instead, the Commission summarily accepted ISO-NE's contention that IEP's broad eligibility is appropriate because it provides "similar compensation for similar service." Order Accepting Tariff Revisions ¶ 62. "This [response] completely disregards the core of petitioners' theory[,]" that IEP is overly inclusive and will give windfall payments to biomass, hydroelectric, nuclear, and coal generating resources. *See Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122,

1127 (D.C. Cir. 2011). In sum, FERC neglected its duties to provide a reasoned analysis for approving IEP.

In addition, FERC's approval of IEP's inclusion of biomass, coal, hydroelectric, and coal resources thwarts the agency's own "longstanding policy that rate incentives must be prospective and that there must be a connection between the incentive and the conduct meant to be induced." *San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 137 (D.C. Cir. 2019) (internal quotation marks and citation omitted). In that regard, this Court has long held that "[a] reward for past behavior . . . does not induce future efficiency and benefit consumers." *Id.* at 138 (internal quotation marks and citation omitted). "Our review of rate-based incentive programs has never questioned the obvious proposition that the Commission will not, and cannot, create incentives to motivate conduct that has already occurred." *Id.* (internal quotation marks and citations omitted). Above all, the Commission has emphasized that "[t]he function of an incentive is to encourage action that has not yet occurred." *San Diego Gas & Elec. Co.*, 157 FERC ¶ 61,056, at P 15 (Oct. 26, 2016), *aff'd sub nom. San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127 (D.C. Cir. 2019). IEP's compensation scheme simply misses the mark.

Furthermore, FERC's rationale for compensating generators that are unlikely to change behavior—because IEP is designed to provide "similar compensation for similar service"—is not compelling, especially in light of the agency's precedent. Order Accepting Tariff Revisions ¶ 62. As mentioned, in 2016, FERC concluded that compensating "resources that do not provide any additional benefit to winter reliability for the sake of fuel neutrality alone" is inappropriate. Order Denying Rehearing ¶ 13. But in its June 2020 order, FERC did not make any attempt to explain why it now believes it is appropriate for ISO-NE to compensate generators that are

unlikely to respond to payment incentives or otherwise increase winter energy security.

Thus, the Commission's analysis in this case contradicts its past rejection of ISO-NE's proposal to compensate generators that will not change behavior in response to program compensation. *See* Order Denying Rehearing ¶ 13. Although FERC is entitled to change its position on whether resources that are unlikely to respond to compensation incentives should be included in winter energy reliability solutions, it "may not . . . depart from a prior policy *sub silentio*." *Fox Television Stations, Inc.*, 556 U.S. at 515 (citation omitted); *see also Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) ("But however the agency justifies its new position, what it may not do is gloss over or swerve from prior precedents without discussion.") (cleaned up). There is nothing in the June 2020 Order that "display[s] awareness that [FERC] is changing position" on this issue and as such demonstrates a lack of reasoned decisionmaking. *Fox Television Stations, Inc.*, 556 U.S. at 515; *NEPGA*, 881 F.3d at 211 ("Although case-by-case adjudication sometimes results in decisions that seem at odds but can be distinguished on their facts, it is the agency's responsibility to provide a reasoned explanation of why those facts matter."); *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) ("We have stressed that '[u]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.'") (quoting *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001)). Instead of grappling with Petitioners' concerns about IEP's windfall payments to generating resources, FERC swept them under the rug. "It [was] arbitrary and capricious to ignore such matters." *See Fox Television Stations, Inc.*, 556 U.S. at 515.

In reviewing FERC's June 2020 Order, we conclude that FERC approved IEP without adequately considering legitimate objections from complainants who pointed out that it would result in windfall payments to nuclear, coal, biomass, and hydroelectric resources. "If continued unchecked, [IEP] would create an impression that the agency is engaging in an uncontrolled giveaway . . . without Congressional warrant . . . and that the courts were abdicating their review responsibility." *Pub. Serv. Comm'n of N.Y. v. FERC*, 589 F.2d 542, 560 (D.C. Cir. 1978). Accordingly, we conclude that the June 2020 order's acceptance of compensation incentives—for a distinct category of generators that are unlikely to respond to those incentives—was arbitrary and capricious. As noted above, however, we do not believe that the Commission acted arbitrarily or capriciously in approving other aspects of IEP. We therefore turn next to determining the appropriate remedy.

## IV.

On judicial review, whether an agency order is severable turns on the agency's intent. *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citing *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 929 (D.C. Cir. 2017)). "Where there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted, partial affirmance is improper." *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984); *see also Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997); *New Jersey v. EPA*, 517 F.3d 574, 583–84 (D.C. Cir. 2008). Additionally, a reviewing court must consider "whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broad. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988)); *see* 3 Kristin E. Hickman &

Richard J. Pierce, Jr., <u>Administrative Law Treatise</u> § 20.3 (6th ed. 2019) (collecting cases where courts have vacated a segment of an agency's rule or final order and otherwise remanded to the agency) (citing *Arizona Pub. Serv. Co. v. EPA*, 562 F.3d 1116 (10th Cir. 2009) and *Sorensen Commc'ns Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014)).

In essence, to extract the agency's intent, we ask whether there is substantial doubt that FERC would have adopted IEP if it omitted—from the outset—resources that would not change their behavior in response to IEP. Although none of the applicable cases definitively establish what is sufficient to show "substantial doubt," we have previously considered whether the challenged portion of the agency order "is in any way intertwined" with the unchallenged portion of the order or if "they operate entirely independently of one another." *Davis Cnty.*, 108 F.3d at 1459 (internal quotation marks and citation omitted); *Carlson*, 938 F.3d at 351; *Epsilon Elecs.*, 857 F.3d at 929; *Telephone & Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994). Our precedent reflects that the heart of the inquiry is whether "'there is substantial doubt that the agency would have adopted'" IEP if it had never included nuclear, biomass, coal, and hydroelectric generators in the first place "'on its own'" and whether IEP can "function sensibly" without them. *New Jersey*, 517 F.3d at 584 (quoting *Davis Cnty.*, 108 F.3d at 1459); *North Carolina*, 730 F.2d at 796; *Sierra Club*, 867 F.3d at 1366–67; *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C. Cir. 2021).

For the reasons explained below, we determine that the Commission's June 18, 2020 order is severable with respect to IEP's inclusion of coal, nuclear, biomass, and hydroelectric generators and therefore partial vacatur of the Commission's approval of IEP is appropriate. Based on the record before us, there is not "substantial doubt" that the agency would have

adopted IEP without the inclusion of nuclear, coal, biomass, and hydroelectric generators "on its own." *See Davis Cnty.*, 108 F.3d at 1459. We believe FERC "would have adopted the same disposition"—meaning that it would have approved IEP—even if ISO-NE had not proposed to include compensation for nuclear, coal, biomass, and hydroelectric generators in the first place. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019). Moreover, the parts of the FERC order approving IEP that remain in place can "function sensibly without the stricken provision[s]" of IEP. *See id.* at 351 (internal quotation marks and citations omitted).

To be sure, in its Order, FERC did not explicitly address whether any portion of IEP was severable. *Cf. Am. Fuel*, 3 F.4th at 384.

Even so, the June 2020 order makes clear that the agency's primary concern is addressing the Northeast's imminent and dire fuel energy security risk with a stopgap, short-term solution to a "misaligned incentives problem." Order Accepting Tariff Revisions ¶ 62. FERC does not say outright that the coal, nuclear, biomass, and hydroelectric generators face a "misaligned incentives problem" so it is conceivable that FERC could have concluded that their exclusion would not necessarily detract from IEP's overall goal. But more significantly, there are other categories of generators in the program that would meet ISO-NE's proposed conditions for selling inventoried energy, including oil, refuse, and natural gas generators. Thus, we do not believe there is substantial doubt that FERC would have approved IEP had the coal, nuclear, biomass, and hydroelectric generators not been included from the start. Under those circumstances, the administrative record supports the finding that in FERC's view, IEP could still be fairly described as "a short-term solution that helps address the misaligned incentives problem that currently

exists in the Tariff" by "compensat[ing] fuel-secure resources . . . which will likely provide reliability benefits." *Id.* ¶ 58.

FERC's own past precedent also reinforces this conclusion. *See ISO New Eng., Inc.*, 152 FERC ¶ 61,190 (2015) ("Order on Proposed Tariff Revisions"). As mentioned, in a prior order, FERC considered two competing winter reliability proposals, including the Winter Reliability Program proposal submitted by ISO-NE, and found unreasonable ISO-NE's pitch to compensate generators whose behavior would not change in response to program payments. *Id.* ¶ 47 ("While ISO-NE expanded the types of resources eligible to participate in the program, the record does not reflect that including the additional resource types under the same general program principles will incent any additional fuel procurement."). NEPOOL, the other entity that submitted a proposal argued that ISO-NE's proposed program "would compensate nuclear, coal, and hydro resources for doing precisely what they already have been doing in preparation for energy and reserve market operations during the winter months." *Id.* ¶ 18. FERC rejected ISO-NE's proposal. *Id.* at 61,900; *see also* Order Denying Rehearing ¶ 13. That FERC has previously rejected ISO-NE's inclusion of generators that would not change their behavior in response to payments for storing energy reflects that there is not substantial doubt that the Commission would have approved IEP if ISO-NE had excluded that same category of generators when it first proposed IEP.

We turn next to whether IEP can function sensibly without the inclusion of nuclear, coal, biomass, and hydroelectric generators, whose on-site energy storage practices are unlikely to be affected by IEP's compensation incentives. We believe that the remainder of IEP can function without the inclusion of these resources. The record reflects that other categories of generators—including oil, refuse, and natural gas-based

resources—are eligible to participate in IEP and are in a position to be incentivized to participate. Moreover, wind and solar resources that are coupled with a battery storage system are eligible to participate and contribute to IEP's objective of enhancing winter energy security. Finally, if IEP were to include nuclear, coal, biomass, and hydroelectric generators, these entities would store up to three days' worth of fuel anyway because it is their standard practice and thus, by default, they contribute to energy reliability in the winters. Therefore, there is strong record evidence that demonstrates that IEP, even without the excluded resources, is designed to improve the Northeast's energy reliability when there is stress on the region's grid in future winters. Accordingly, we find that this portion of IEP is severable from the remainder of the Commission's June 2020 order and therefore vacate this portion.

In summary, we will leave intact the Commission's June 2020 order except for the portion of IEP that is arbitrary and capricious: the agency's inclusion of nuclear, biomass, coal, hydroelectric generators. We believe there is not substantial doubt that FERC would have adopted IEP if it had not included these resources in the first place. And IEP can function sensibly without them.

**V.**

For the reasons discussed above, we uphold all but one component of the Commission's decision to approve ISO-NE's proposed tariff revisions implementing the Inventoried Energy Program. We find that the Commission's approval of the proposal's inclusion of nuclear, coal, biomass, and hydroelectric generators was arbitrary and capricious, and so we vacate that inclusion. As such, we grant in part and deny in part the Petitions before us. We remand to FERC for further proceedings consistent with this opinion.

28

*So ordered.*